**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 12 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MONTGOMERY C. AKERS,

    Defendant - Appellant.

No. 99-1089

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 96-CR-13-B)**

---

Patrick D. Butler of Lamm & Butler, LLC, Louisville, Colorado, for Defendant-Appellant.

Kirby A. Heller, Attorney, Department of Justice, Washington, D.C. (Thomas L. Strickland, United States Attorney; Thomas M. O'Rourke, Assistant United States Attorney, District of Colorado, with him on the brief), for Plaintiff-Appellee.

---

Before **MURPHY** , **ALARCÓN**,[*] and **PORFILIO**, Circuit Judges.

---

    [*]    The Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

**ALARCÓN**, Circuit Judge.

_____

Montgomery C. Akers ("Akers") appeals from the judgment of conviction of fourteen counts of bank fraud and one count of uttering and possessing a counterfeit security with intent to deceive.[1] Akers argues that he is entitled to a reversal of his conviction because the district court deprived him of his constitutional right of self-representation. He also contends that the district court lacked jurisdiction over the bank fraud and counterfeit security charges because the Government failed to allege all the elements of these offenses in the indictment. He also contends that the indictment was invalid because the grand jury relied on perjured testimony. In addition, he maintains that the evidence was insufficient to support his conviction. Finally, he argues that the district court abused its discretion in admitting evidence of his flight, in granting an upward departure in sentencing, and in concluding that it lacked jurisdiction over his motion to recover property seized in the District of Kansas.

We hold that the district court did not err in denying Akers's motion for

---

[1] Akers was also charged with failure to appear as required by the conditions of his pretrial release in violation of 18 U.S.C. § 3146(a)(1). This count was severed and tried separately from the bank fraud charges and the counterfeit security charge. Akers has not appealed from the judgment of conviction for failure to appear.

self-representation.  We also conclude that the indictment was valid and that the indictment and the evidence were sufficient to sustain Akers's conviction. Finally, we conclude that the district court did not abuse its discretion in admitting the evidence of flight, in granting an upward departure, or in finding that it lacked jurisdiction over the motion to recover seized property.   We therefore affirm.

I

In early 1994, Akers bought a motorcycle from Cycles West, Inc., of Wheat Ridge, Colorado.  While buying the motorcycle, Akers became acquainted with Maureen Aeverman, the bookkeeper at Cycles West.  Akers saw Aeverman at the Cycles West store at least once a week between January and June of 1994.  Akers agreed to assist Aeverman in procuring a mortgage so that she could purchase a home.

Vaughn Richards owned 49% of Cycles West and managed the store's day-to-day operations.  Pete Lobato owned the remaining 51% but was not involved in day-to-day operations.  Because only Richards and Lobato had authority to sign checks drawn on the store's checking account, Richards provided Aeverman with a supply of signed checks so that she could use them to pay the store's vendors and suppliers when they made deliveries to the store.  On some of the checks, Richards affixed his signature as the maker and set forth the name of the payee,

but left the amount blank. On other checks, Richards signed his name and left blank both the name of the payee and the amount.

In May 1994, Aeverman told Akers that Bill Kidwell, a Cycles West employee, wanted to buy Lobato's interest in Cycles West. Akers proposed to Aeverman that the two of them work together secretly to help Richards acquire Lobato's interest in Cycles West. Akers told Aeverman that John Tario, an investor with whom he was acquainted, would be willing to loan Richards the money to purchase Lobato's interest in the store.

Akers told Aeverman that Tario would only agree to transfer funds to an existing bank account. He persuaded Aeverman to give him three of the Cycles West checks that Richards had signed without designating the name of the payee or the amount owed. Akers made the three checks payable to Advantage Commercial Investments, Advanced Commercial Investments, and Advanced Commercial Investments and Property Management. He made the three checks payable for a total of $32,500. Richards did not authorize Akers to fill in the name of the payee on these checks or the amount due. These checks were deposited on May 17, 25, and 31, 1994, into an account at the Credit Union of Denver. At Akers's direction, Lynn Durlin, Akers's girlfriend, had opened the account in the name of Advantage Commercial Investments and Property Management. Durlin testified that she was the only authorized user of the

account and that she did not deposit the three checks into the account.

Viewed in the light most favorable to the Government, the record demonstrates that Akers acquired six other signed checks from Aeverman's desk without her knowledge or consent. Each of these checks was altered to make it payable to Akers. The total amount of these checks was $49,890.67. Richards and Aeverman did not authorize anyone to alter these checks. The six checks were deposited into either a savings account in Durlin's name at the Credit Union of Denver or into Akers's account at Virgin Valley Credit Union.

From May 16, 1994, through June 11, 1994, Akers wrote, or caused to be written, nine checks drawn on the Advantage Commercial account that were made payable either to Akers or to Aeverman. The checks made payable to Aeverman were endorsed over to Akers. The nine checks totaled $8,764.86.

In late May and early June 1994, Akers purported to reimburse Cycles West for the amounts taken in order to sustain Aeverman's confidence. He gave her four checks. Two were drawn on the Advantage Commercial account and totaled $22,500. The other two purported to be drawn on the account of Performance Mortgage and totaled $33,435.08. Akers had previously been an employee of Performance Mortgage. On deposit into Cycles West's account, neither Performance Mortgage check cleared.

In early July 1994, Richards became aware of Aeverman's and Akers's

dealings when he received a "stop payment" notice on one of the Performance Mortgage checks. Although he ultimately supported their efforts to help him acquire ownership of Cycles West, Richards made clear to Akers and Aeverman at a July 4, 1994, meeting that all the funds withdrawn from the Cycles West account had to be replaced.

Throughout the months of July and August 1994, Akers continued to present checks to Aeverman, ostensibly to reimburse Cycles West for the funds he had withdrawn. On roughly July 11, 1994, Akers convinced Jeff Hallgren, a Cycles West employee, to write three checks totaling $14,300 that were drawn on Hallgren's own account at the First Bank of Wheat Ridge. The checks were made payable to Akers and endorsed over to Cycles West. Hallgren told Akers that he did not have enough money in his account to cover the checks. Akers assured him that funds would be deposited into his account to cover them. The three checks were deposited in Cycles West's account on July 12, 1994. No funds were deposited into Hallgren's account. On July 13, 1994, a stop payment order was issued on all three checks by the First Bank of Wheat Ridge.

On July 15, 1994, Akers accompanied Hallgren to Commercial Federal Bank in Denver. At Akers's urging, Hallgren opened an account in the name of R.A.H. Enterprises. Hallgren, Aeverman, and Richards's son, Bradley, were the only authorized signatories on the account. On July 26, 1994, Akers deposited

into the R.A.H. Enterprises account the first of two checks purportedly drawn on the payroll account of Coastal Corporation. The amount of that check was $34,550. Later the same day, Akers directed Aeverman to draft a check drawn on the R.A.H. Enterprises account made payable to Cycles West in the amount of $25,000. Aeverman deposited that check into Cycles West's account the same day. But for the deposit of the Coastal Corporation check, there would not have been sufficient funds in the R.A.H. Enterprises account to cover the $25,000 check.

On August 19, 1994, Akers deposited into the R.A.H. Enterprises account a second check purportedly drawn on the payroll account of Coastal Corporation. The amount of that check was $38,800.65. On August 23, 1994, he directed Aeverman to draft a check payable to Cycles West in the amount of $12,500. She deposited the check into Cycles West's account the same day. But for the deposit of the Coastal Corporation check, there would not have been sufficient funds in the R.A.H. Enterprises account to cover the $12,500 check.

From August 11 through August 20, 1994, signatories of the R.A.H. Enterprises account also issued five checks made payable to Akers. Those five checks totaled $6,110.

The evidence is undisputed that the two checks purportedly drawn on Coastal Corporations's payroll account that Akers deposited into the R.A.H.

Enterprises account were counterfeit. Coastal Corporation had no record of issuing the two checks. Additionally, they were the wrong color and were made out to a business entity instead of to an employee of Coastal Corporation. Akers had formerly been an employee of a subsidiary of Coastal Corporation and had received a paycheck from Coastal Corporation.

A criminal complaint was filed against Akers on December 18, 1995. A warrant for his arrest was issued on the same day. Akers was arrested on December 20, 1995. On or about December 22, 1995, Assistant Federal Public Defender Warren Williamson was assigned to represent Akers. An indictment charging Akers with one count of uttering and possessing a counterfeit security was filed on January 23, 1996. On January 30, 1996, the court granted Akers pretrial release to Independence House, a halfway house in Denver, Colorado. His trial was scheduled to begin April 1, 1996.

On February 23, 1996, Akers moved for a continuance of the trial date. On March 5, 1996, Williamson moved to withdraw as counsel for Akers. Williamson explained in his motion that "the relationship between counsel and the defendant has deteriorated to the point that it will be impossible, in counsel's opinion, for them to work together effectively." The district court granted the motion on March 8, 1996, and appointed Nathan Chambers to represent Akers. The district court also granted Akers's motion to continue the April 1, 1996, trial date. The

court set the matter for trial on September 30, 1996.

On September 3, 1996, the district court granted Akers's motion to substitute retained counsel Lance Isaac for Chambers. In the same order, the district court denied Isaac's oral motion for a continuance of Akers's September 30, 1996, trial date.

Akers left Independence House without permission on September 17, 1996, in violation of the terms of the pretrial release order. On September 26, 1996, the district court vacated the September 30, 1996, trial date and issued a warrant for Akers's arrest. He was apprehended by U.S. Marshals in Overland, Kansas, on January 17, 1997. At the time of Akers's arrest, the U.S. Marshals seized from Akers $5,813 in currency, $1,000 in traveler's checks, and a $465 money order.

On August 6, 1997, the grand jury returned a superseding indictment. The indictment charged Akers with fifteen counts of bank fraud in violation of 18 U.S.C. § 1344, one count of uttering and possessing a counterfeit security in violation of 18 U.S.C. § 513(a), and one count of failure to appear in violation of 18 U.S.C. § 3146(a)(1).

On August 11, 1997, the court severed the charge of failure to appear and set it for trial on August 18, 1997. The court also ordered that trial on the remaining charges would begin September 29, 1997. On August 19, 1997, a jury found Akers guilty of the failure to appear charge.

On August 28, 1997, Akers filed a pro se motion in which he requested that Isaac be removed as his attorney because of irreconcilable differences and a conflict of interest. In the same motion, Akers requested leave to represent himself at his trial. Akers also asserted that:

> if this motion is providentially granted, he will be in need of investigative resources and professional witnesses to be supplied under the Criminal Justice Act, that are not currently available to him due to tangible funds held erroneously by the United States Secret Service, and present defense counsel's failure to be able to provide this necessary function to bring about the truth of defendant's situation, and the outrageous governmental misconduct that has been allowed to flagrantly operate in this case.

In order to preserve the attorney-client privilege, he also asked the court to permit him to set forth in an ex parte hearing the facts demonstrating that he could not receive effective representation from Isaac. Finally, Akers stated that "the defendant does not wish to apply for an extension of time, and trial can proceed as scheduled on September 29, 1997."

On September 11, 1997, Akers filed another pro se motion in which he requested that the court appoint an "investigator and professional witnesses that will be required to give testimony at trial to the veracity of their investigations." Akers asserted in support of this motion that "[c]ounsel of record has failed to fully investigate the information available concerning this case, and with total calculation, has attempted to dupe the defendant with misleading facts and

circumstances involved with the present investigator who has allegedly done some investigation thus far." Akers argued that "because of the series of new events and tangible evidence that has not been investigated thus far, his need for professional services is essential to dispel clandestine facts that have been so far ignored."

On September 18, 1997, the district court denied Akers's pro se motions after concluding that the "differences" between Akers and Isaac did not "rise to the level of the type of conflict of interest that would require that Mr. Isaac be relieved of his defense duties." The case proceeded to trial as scheduled on September 29, 1997. On October 6, 1997, a jury found Akers guilty of fourteen counts of bank fraud and one count of uttering and possessing a counterfeit security. Akers was acquitted of one count of bank fraud.

On February 18, 1999, the district court sentenced Akers to 105 months' imprisonment. On February 25, 1999, Akers filed a timely notice of appeal from the judgment of conviction and the court's sentencing decision. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

II

A

Akers contends that we must reverse the judgment of conviction because the district court deprived him of his Sixth Amendment right of self-

representation.[2] The denial of a defendant's right of self-representation "is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984). We review de novo whether a constitutional violation occurred and we review for clear error the factual findings underlying the district court's decision to deny the request for self-representation. United States v. Mackovich, Nos. 99-2006 & 99-2179, 2000 WL 485091, at *7 (10th Cir. Apr. 25, 2000).

A criminal defendant has a constitutional and a statutory right to waive his right to counsel and represent himself at trial. See Faretta v. California, 422 U.S. 806, 807 (1975) (holding that the Sixth Amendment right to counsel necessarily implies the right to proceed pro se); see also 28 U.S.C. § 1654 (codifying the right of defendants in federal prosecutions to self-representation). The right of self-representation, however, is not absolute. See United States v. Allen, 895 F.2d 1577, 1578 (10th Cir. 1990) ("The right to make a knowing and intelligent waiver of the right to counsel does not grant the defendant license to play a cat and mouse game with the court . . . ."(quotations omitted)). "When faced with a situation of potential abuse, the district court may properly impose restraints on

---

[2] Akers does not contend in this appeal that the district court erred in failing to find that his retained counsel should be removed because of irreconcilable differences and a conflict of interest. Therefore, we do not consider that issue.

the right to reject counsel to prevent the right from being manipulated so as to obstruct the orderly procedure of the courts." United States v. Padilla, 819 F.2d 952, 959 (10th Cir. 1987).

To invoke the right of self-representation, the defendant must satisfy three requirements. "First, the defendant must 'clearly and unequivocally' assert his intention to represent himself." Mackovich, 2000 WL 485091, at *7 (quoting Floyd, 81 F.3d 1517, 1527(10th Cir. 1996)). Second, "the defendant must 'knowingly and intelligently' relinquish the benefits of representation by counsel." Id. (quoting United States v. Boigegrain, 155 F.3d 1181, 1185-86 (10th Cir. 1998)). Third, "the defendant must make this assertion in a timely fashion." Id. (citing United States v. McKinley, 58 F.3d 1475, 1480 (10th Cir. 1995)).

The district court properly denies a request for self-representation where it finds the request was made to delay the trial. See id. at *8 (affirming the denial of a request for self-representation made two weeks before the scheduled trial date where evidence in the record supported the district court's conclusion that the request was "merely a tactic for delay"); see also Hamilton v. Groose, 28 F.3d 859, 862 (8th Cir. 1994) ("[A] defendant may not manipulate [the right of self-representation] in order to delay or disrupt his trial."); United States v. Flewitt, 874 F.2d 669, 674 (9th Cir. 1989) ("Of course, a request for self-representation need not be granted if it is intended merely as a tactic for delay."); Chapman v.

United States , 553 F.2d 886, 887 (5th Cir. 1977) ("We hold that a demand for self-representation must be honored as timely if made before the jury is selected, absent an affirmative showing that it was a tactic to secure delay.").

We agree with Akers that his motion was timely. A motion for self-representation is timely if it is made before trial. See United States v. Beers , 189 F.3d 1297, 1303 (10th Cir. 1999), cert. denied , ___ U.S. ___, 120 S. Ct. 1696 (2000). Here, Akers filed his motion to represent himself more than one month prior to trial.

It was not a perceived lack of timeliness, however, that led the district court to deny Akers's request. The district court explained that its decision was "based upon the finding and conclusion that the motion is interposed for delay and the Court has an independent duty to bring this case to a timely resolution." The district court's finding that Akers's motion for self-representation was interposed for delay is supported by the evidence in the record. Akers was arrested on December 20, 1995. The case did not proceed to trial until September 29, 1997. Between those two dates, Akers successfully delayed the commencement of trial on the dates set by the court by repeatedly substituting counsel, by filing multiple pretrial motions, and by fleeing the jurisdiction for four months. In light of Akers's prior success in preventing his case from going to trial, the district court did not clearly err in finding that Akers's motion to

represent himself was one more attempt to delay the moment of truth.

While representing to the court in his August 28, 1997, motion that he would not request a continuance of the trial date, Akers alleged in his September 11, 1997, motion that he needed an investigator and the assistance of expert witnesses because of a "series of events and tangible evidence" that his retained counsel had failed to investigate. The district court found that Akers's assertion that he would not seek a continuance could not be reconciled with his request for an investigator and other expert witnesses to assist in the preparation of his defense. The court explained its decision as follows:

> Well I don't know how we can [adhere to the scheduled trial date] if he wants another investigator to go out and further investigate, he wants a handwriting expert. You can't get to trial within that amount of time in view of the other motions that he's filed. I mean those motions would have to be heard, and I would have to consider independent investigators, I would have to consider independent handwriting experts, and what I firmly am of the view would occur is that I would receive a further flurry of motions. But we can't get to trial a week from next Monday with the prospect of facing the motions that Mr. Akers filed and dealing with them.

Akers argues that the district court should have tested the sincerity of his request to represent himself by telling him that no extensions of time would be granted and standing firm in that position if he still chose to proceed pro se. In support of this proposition Akers relies on dictum in United States ex rel.

Maldonado v. Denno, 348 F.2d 12 (2nd Cir. 1965). In Denno, the Second Circuit affirmed a grant of habeas corpus relief and held that it is a constitutional violation to deprive a defendant of the right of self-representation if his request is timely and unequivocal. Id. at 15-16. The state court in Denno had denied Maldonado's request for self-representation after his retained counsel withdrew because he had not been paid. Id. at 14. Instead of allowing Maldonado to proceed pro se, the state court appointed the attorney for DiBlasi, Maldonado's codefendant, to represent Maldonado as well. See id. On appeal to the Second Circuit, the State argued that "if Maldonado and DiBlasi had been allowed to represent themselves, the trial judge would have been obliged also to grant them a continuance so that they might prepare their defenses." Id. at 16. The court's reply to this hypothetical question was that, "[o]n the contrary, the trial judge would have been entirely justified, once their cases had been called, in insisting that the two men proceed to trial at once, with or without the lawyer who had been assigned to them." Id. at 16.

The Denno court cited two cases as authority to support this conclusion, United States v. Mitchell, 137 F.2d 1006 (2nd Cir. 1943), and United States v. Paccione, 224 F.2d 801 (2nd Cir. 1955). Neither Mitchell nor Paccione, however, supports the court's conclusion. In Mitchell, the defendant sought to dismiss his appointed attorney on the second day of trial and the trial court denied the

request.  Id. at 1010.  The Second Circuit held that the denial of the right of self-representation was not reversible error "because we have no showing that he was trying to exercise [the right to conduct his own defense] and none that he was ever prevented therefrom."  Id.

In Paccione, the district court denied the defendant's request to secure substitute counsel ten days after the jury had been drawn and on the day that trial was to begin.  Id. at 802.  The Second Circuit affirmed, holding that "no fair reason was shown for causing further delay in starting the trial which such a belated attempt to have other counsel present would entail."  Id.  Neither Mitchell nor Paccione speaks to whether a trial court can grant a request for self-representation and then force the defendant to trial without allowing him time to prepare a defense.

Denno, then, does not persuasively support Akers's contention that the district court could have tested the sincerity of his request to represent himself by granting that request and forcing Akers to proceed to trial as scheduled.  Indeed, such a course of action by a trial court may well be reversible error.  If a trial court determines that a defendant has made an unequivocal, intelligent, and timely request for self-representation that is not merely a ploy to delay the start of trial, it arguably would be an abuse of discretion and a denial of due process to  deny the defendant's request for a continuance to prepare for trial.  This issue was

-17-

squarely presented to the California Court of Appeal in <u>People v. Cruz</u>, 83 Cal.

App. 3d 308 (1978).  In <u>Cruz</u>, prior to granting the defendant's motion to

represent himself, the master calendar judge warned the defendant on October 22

that no continuances would be granted:

> [I]f you proceed and as your lawyer in pro per, you will be
> expected to be ready for trial on November 23rd and telling me
> at that time or the Court that you have had some problems
> because you are in custody and you are not ready to go to trial
> because you have been in custody and you haven't been able to
> prepare the lawsuit properly will not be considered a good
> cause for a continuance. Do you understand what I have said to
> you?
>
> The Defendant: Yes, sir.
>
> The Court: You still want to be your own lawyer?
>
> The Defendant: Yes, sir.
>
> The Court: All right.  We will see you on the 23rd."

<u>Id.</u> at 322-23.  On November 23, the defendant filed a motion for a continuance,

asserting he had insufficient time to prepare his defense.  <u>See id.</u> at 323.  The trial

court denied the motion.  In holding that the denial of a continuance was an abuse

of discretion, the California Court of Appeal stated that "[t]he concern for orderly

judicial administration must not be the means used to deny a defendant a full and

fair trial."  <u>Id.</u> at 326.

This court has recognized that

"[i]n ambiguous situations created by a defendant's vacillation or

-18-

manipulation, we must ascribe a 'constitutional primacy' to the right to counsel because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation."

Mackovich, 2000 WL 485091, at *8 (quoting United States v. Frazier-El, 204 F.3d 553, 559 (4th Cir. 2000)). Bearing in mind the "constitutional primacy" of the right to counsel, we conclude that the district court did not err in denying Akers's request to represent himself at trial.

B

Akers also argues that the indictment and the evidence against him were fatally insufficient and that his convictions therefore should be reversed. We review de novo the sufficiency of an indictment. See United States v. Bolton, 68 F.3d 396, 400 (10th Cir. 1995). We also review de novo whether the evidence was legally sufficient to support a conviction. See United States v. Wolny, 133 F.3d 758, 760 (10th Cir. 1998). We will find the evidence sufficient if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Jackson v. Virginia, 443 U.S. 307, 319 (1979).

1

With respect to the charge of uttering and possessing a counterfeit

-19-

security, Akers contends that the indictment failed to allege that the Coastal

Corporation checks were counterfeit securities. This contention is without merit.

The indictment in fact alleges that Akers

> knowingly uttered and possessed a counterfeited security of an
> organization, that is, a counterfeited Coastal Corporation check,
> bearing number 983584, dated July 23, 1994, drawn on Citibank
> Delaware, in the amount of $34,550.00, with intent to deceive
> another person or organization.

Akers also contends that the evidence introduced at trial was insufficient

to support a rational conclusion that the Coastal Corporation checks were

counterfeit and that Akers knew them to be counterfeit. We disagree. William

Landuyt, the director of central payroll operations for the Coastal Corporation,

testified that Akers had previously worked for a subsidiary of Coastal

Corporation. He testified that Akers was issued a paycheck drawn on Coastal

Corporation's payroll account in December 1993. Landuyt also testified that the

two checks deposited into the R.A.H. Enterprises account were not Coastal

Corporation payroll checks because they were the wrong color and were made

payable to an entity rather than an individual. He further testified that Coastal

Corporation had no record of issuing the two checks that were deposited into the

R.A.H. Enterprises account.

Robert Theide, an expert in the field of forensic document examination,

testified that it was his opinion that Akers had endorsed the back of one of the

two counterfeit Coastal Corporation checks. Taken together, the testimony of Landuyt and Theide was sufficient to support an inference that Akers was responsible for the production and presentation of the counterfeit Coastal Corporation checks for deposit to Commercial Federal Bank and that he knew they were counterfeit.

We find no merit to Akers's argument that the Coastal Corporation checks were not counterfeit because they were obviously not authentic and therefore did not "purport to be genuine." See 18 U.S.C. § 513(c) (defining a counterfeit document as one that "purports to be genuine but is not, because it has been falsely made or manufactured in its entirety"). We are satisfied that the Coastal Corporation checks purported to be genuine.

2

The federal bank fraud statute provides that

Whoever knowingly executes, or attempts to execute, a scheme or artifice–

(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. This court has held that the elements of bank fraud are: "(1)

-21-

that the defendant knowingly executed or attempted to execute a scheme (i) to defraud, or (ii) to obtain property by means of false or fraudulent pretenses, representations or promises; (2) that defendant did so with the intent to defraud; and (3) that the financial institution was then insured by the Federal Deposit Insurance Corporation." United States v. Rackley, 986 F.2d 1357, 1360-61 (10th Cir. 1993) (citing 18 U.S.C. § 1344).

The indictment alleges, in pertinent part, that Akers

> knowingly executed and attempted to execute a scheme to defraud the Credit Union of Denver, Colorado National Bank and Commercial Federal Bank and to obtain money owned by and under the custody and control of the Credit Union of Denver, Colorado National Bank and Commercial Federal Bank by means of false and fraudulent pretenses, representations and promises.

The indictment also alleges that

> Credit Union of Denver was a financial institution, the accounts of which were insured by the National Credit Union Administration. . . .
> Colorado National Bank . . . . and Commercial Federal Bank [were] financial institution[s], the deposits of which were insured by the Federal Deposit Insurance Corporation.

"[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." United States v. Wood, 6 F.3d 692, 698 (10th Cir. 1993) (quoting Hamling v. United States, 418

-22-

U.S. 87, 117 (1974)).  Because the indictment here tracks the language of the statute and clearly sets forth all the elements of the crime of bank fraud as they have been recognized by this court, we conclude that it was sufficient.

We reject Akers's contention that the indictment had to allege that Akers put a federally insured bank at risk of loss.  To support his argument, Akers relies on United States v. Young, 952 F.2d 1252 (10th Cir. 1991), where this court analyzed a conviction under § 1344(1).  In clarifying what constitutes a "scheme to defraud" within the meaning of § 1344(1), this court stated that "[t]o support a § 1344 conviction the government does not have to prove the bank suffered any monetary loss, only that the bank was put at potential risk by the scheme to defraud."  Id. at 1257.  This court did not hold, however, that potential risk of loss to the bank was a separate element that had to be alleged in the indictment.  Moreover, this court subsequently explained that the holding in Young applied only to charges brought under § 1344(1) and did not apply to charges brought under § 1344(2).  See United States v. Sapp, 53 F.3d 1100, 1103 (10th Cir. 1995) ("We therefore hold that the government need not prove that a defendant put a bank 'at risk' to sustain a conviction under section 1344(2).").  The indictment here charged Akers under both § 1344(1) and (2), not solely under § 1344(1).

Akers also argues that the evidence was insufficient to support his

conviction on fourteen counts of bank fraud. His theory appears to be that the evidence at trial showed that he defrauded friends, associates, and entities like Cycles West and Coastal Corporation but not that he defrauded the banks.

A person violates the bank fraud statute when he knowingly executes a scheme to obtain money from a financial institution by means of material, fraudulent representations. See United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992) (citing 18 U.S.C. § 1344). Akers points to United States v. Rodriguez, 140 F.3d 163 (2nd Cir. 1998), as authority for the proposition that the act of depositing checks into an account by a person who is not entitled to the funds is not, without more, bank fraud. Id. at 168-69 (vacating a conviction for bank fraud for insufficient evidence). His argument that this rule applies to him fails because the evidence here showed that Akers did far more than just deposit unauthorized checks. The evidence introduced at trial demonstrates that Akers deposited checks into accounts he was not authorized to use and also drafted, or caused to be drafted, checks drawn on accounts he was not authorized to use. Akers enlisted Durlin to open the account at the Credit Union of Denver in the name of Advantage Commercial Investments. Durlin testified that she was the only signatory on the account but that checks drawn on Cycles West's account were deposited into the Advantage Commercial account by someone else. The evidence also showed that nine checks were drawn on the Advantage Commercial

-24-

account that were either made payable to Akers or endorsed over to him. Durlin testified that she had signed some of those checks and left the payee and amount blank before giving them to Akers. She testified that her signature had been forged on the remainder of the checks drawn on the Advantage Commercial account.

Testimony at trial also demonstrated that Akers induced Hallgren to open the R.A.H. Enterprises account at Commercial Federal Bank. Akers was not an authorized signatory on that account. At trial, Hallgren and Aeverman, both authorized users of the account, denied having deposited the two Coastal Corporation checks into the R.A.H. Enterprises account. The record also shows that, at Akers request, Hallgren, Aeverman, or both signed five checks drawn on the R.A.H. Enterprises account and made payable to Akers.

In making deposits of unauthorized checks and in drafting, or causing to be drafted, checks drawn on those funds, Akers exposed Colorado National Bank, Commercial Federal Bank, and the Credit Union of Denver to risk of loss. See Young, 952 F.2d at 1257 (noting that, where the defendant's conduct exposed the financial institution to civil litigation, the conduct exposed the financial institution to risk of loss) (citing United States v. Morgenstern, 933 F.2d 1108, 1114 (2nd Cir. 1991)). Moreover, had Akers not pretended to be an authorized user of the affected accounts, the financial institutions may have

-25-

handled the deposits into, and checks drawn on, those accounts differently.  See

Rodriguez , 140 F.3d  at 168 (defining a material misrepresentation as one

"capable of influencing a bank's actions").

"Congress enacted the current bank fraud statute . . . in 1984 in response

to various Supreme Court decisions which narrowed the application of the then

existing bank fraud statute.  The [current] bank fraud statute was modeled after

the mail and wire fraud statutes, which courts have construed very broadly. . . .

Likewise, courts have construed the bank fraud statute liberally."  Young , 952

F.2d at 1255-56 (citations and footnote omitted).  The statute "was intended to

reach a wide range of fraudulent activity that undermines the integrity of the

federal banking system."  Rackley , 986 F.2d at 1361.

In a case where an employee deposited checks stolen from her employer

into an unauthorized account, represented to the bank that she was a signatory on

that account, and drafted checks drawn on the amounts deposited into the

account, this court held that the defendant's conduct was cognizable as a

violation of the bank fraud statute.  Young , 952 F.2d at 1257.  The evidence

presented at Akers's trial was legally sufficient to support a rational conclusion

that, in carrying out his scheme, Akers made unauthorized use of bank accounts

that left federally insured financial institutions at risk of loss. This conduct

constituted bank fraud.

C

Akers asserts that the district court abused its discretion in admitting evidence of his flight from Independence House on September 17, 1996, twelve days before he was scheduled to go to trial on the bank fraud and the counterfeit security charges. He maintains that "the flight evidence proffered by the prosecution does not give rise to a valid conclusion of guilt because (1) it is impossible to tell what crime resulted in the flight and (2) the flight occurred more than two years after commission of the alleged crimes." "The decision whether to admit evidence of a defendant's flight at trial is a matter within the discretion of the trial court." United States v. Lacey, 86 F.3d 956, 973 (10th Cir. 1996).

This court has previously declined to adopt a rule that a defendant's flight must occur soon after his arrest to be probative of guilt, reasoning "that evidence of flight that occurs in close temporal proximity to other significant events in the course of prosecution (such as the commencement of trial) may also be probative of the defendant's guilt." Id. (emphasis added). The proximity of the date of Akers's flight to both the date his trial was scheduled to begin and the date the district court denied his motion for a continuance is sufficient to sustain an inference that his flight was related to these "significant events." The court did not abuse its discretion in determining that his flight was probative of

-27-

consciousness of guilt.

This court has also rejected the notion that, in order for evidence of flight to be admissible in a criminal prosecution, there can be only one possible explanation for the defendant's flight: guilt of the crime or crimes charged. See United States v. Lepanto, 817 F.2d 1463, 1467 (10th Cir. 1987) (holding that guilt of the charged offense need not be the only possible inference to be drawn from evidence of flight, it need only be a permissible inference). Here, the district court instructed the jury that evidence of flight is neither dispositive nor necessarily inculpatory:

> The flight or concealment of a person after he is accused of a crime that has been committed is not sufficient in itself to establish his guilt, but it is a fact that, if proved, may be considered by the jury in the light of all other proved facts in deciding whether–deciding the question of guilty or not guilty. Whether or not evidence of flight or concealment shows a consciousness of guilt and the significance, if any, to be attached to such a circumstance are matters for determination by you the jury.

Because Akers's flight began two weeks after the district court denied his motion for a continuance and two weeks before his trial was to begin, we conclude that consciousness of guilt of the charged offenses was a permissible inference to be drawn from his flight. We also are persuaded that the probative value of this evidence substantially outweighed any danger of undue prejudice.

D

-28-

Akers next contends that, in indicting him for uttering and possessing a counterfeit security, the grand jury relied on Aeverman's perjured testimony. He argues that the indictment was therefore invalid as to that count and his conviction on that count must be reversed. Because relief from conviction is an "extreme remedy," this court will only grant it in rare circumstances where prosecutorial misconduct is "flagrant or vindictive." United States v. Yost, 24 F.3d 99, 102 (10th Cir. 1994).

Akers contends that Aeverman testified before the grand jury that Akers personally deposited the two counterfeit Coastal Corporation checks into the R.A.H. Enterprises account. At trial, Aeverman testified that she did not see Akers deposit the checks but that she believed he had done so because "Mr. Akers told me he was the one that put the deposits together" for the R.A.H. Enterprises account into which someone deposited the two Coastal Corporation checks. Akers points to this inconsistency as evidence that Aeverman perjured herself before the grand jury. He further contends that the Government was aware that she had perjured herself and failed to bring the perjury to the attention of Akers or the court.

In Yost, this court was confronted with facts analogous to those presented in the instant case. The defendants in Yost were convicted of arson and insurance fraud. Id. at 101. They contended that the indictments on which they

had been convicted were tainted by the false testimony of a government witness. See id. at 102. The witness was a federal agent who testified that he had interviewed an eyewitness who stated that he saw the defendants' pickup truck parked in front of the location where the fire occurred. See id. At trial, the eyewitness testified that he did see a vehicle parked outside the location that morning but that he could not positively identify it as the defendants' pickup truck or as a pickup truck at all. See id. The same eyewitness had given at least one other person the impression that he saw the defendants' pickup truck. See id.

This court concluded that there was "at most some overstatement by [the witness] before the grand jury or simply a misunderstanding regarding [the eyewitness's] degree of certainty rather than any serious misconduct." Id. This court also noted that the eyewitness's "uncertainty was later made eminently clear to the jury at trial." Id. This court affirmed the convictions, reasoning that the case "involve[d] nothing approaching [the] sort of misconduct" that would be necessary to justify relief from conviction. Id.

At worst, Aeverman failed to explain to the grand jury the basis for her conclusion that Akers had deposited the checks. Her testimony at trial made clear that she did not see Akers deposit the checks, but rather inferred that he had done so from his statements to her. There is no evidence that the Government

-30-

knowingly introduced false testimony before the grand jury or that the prosecutor's conduct was flagrant and vindictive. We conclude there is no basis for granting Akers relief from his conviction.

III

Akers contends that the district court erred in departing upward in calculating his sentence under the United States Sentencing Guidelines. Based on Akers's total Offense Level of 17 and his Criminal History Category of VI, he was eligible under the Sentencing Guidelines for a term of imprisonment in the range of fifty-one to sixty-three months. After concluding that Akers's criminal history was exceptional, however, the district court granted the Government's motion for an upward departure. The district court concluded that, because Akers had fifteen more criminal history points than necessary to be in Criminal History Category VI and had three additional criminal history points that "narrowly missed" being counted, an Offense Level of 22 would appropriately account for the underrepresentation of his criminal history. The sentencing range for an Offense Level of 22 and a Criminal History Category of VI was 84 to 105 months of imprisonment. The district court imposed a sentence of 105 months' imprisonment.

In reviewing a departure from the Sentencing Guidelines, we must evaluate: "(1) whether the factual circumstances supporting a departure are

permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable [United States Sentencing] Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable." United States v. Bartsma, 198 F.3d 1191, 1195 (10th Cir. 1999). "We review all four steps of the departure analysis under a unitary abuse of discretion standard." Id. "When the district court's decision to depart is based on factual findings, the decision is entitled to substantial deference." Id. (quotations omitted).

The Guidelines encourage upward departure "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S. Sentencing Guidelines Manual § 4A1.3 (1998); see also United States v. Lowe, 106 F.3d 1498, 1501-02 (10th Cir. 1997). The district court therefore relied on a permissible departure ground in imposing the upward departure.

Akers does not dispute that § 4A1.3 permits upward departure on the basis of an underrepresented criminal history. Instead, he focuses his argument on the second of the four factors enumerated above. He contends that all of the prior offenses considered by the district court were "non-violent and relatively small-

-32-

scale." He argues that his criminal history therefore was not sufficiently exceptional to permit the court to depart upward.

In explaining its sentencing decision to Akers, the district court acknowledged that, in order for it to be able to justify upward departure, the underrepresentation of Akers's criminal history had to be exceptional. The district court stated:

> Yours is an egregious criminal record in which even the Guideline range for a Criminal History Category of VI is not adequate to reflect the seriousness of the defendant's criminal history. . . . I do find that your criminal history is so severe that it is indeed exceptional from other cases involving Criminal History Category Level VI. You have 28 criminal history points, all of which are for conduct similar to this offense or for very serious nonsimilar conduct, such as the two escape convictions, which themselves are similar to the nonappearance conviction in this case.
>
> Clearly since the late '70s, if not even before, you engaged in committing increasingly sophisticated fraud schemes as your livelihood. You have made no documentable effort to retain any sort of legitimate employment. Rather you have, as demonstrated in this case, used legitimate employment, as you did in this offense, to obtain instruments, paychecks to further your fraudulent schemes.
>
> I am satisfied from the evidence presented at trial and during this hearing that you engaged in post-flight criminal conduct, in that you falsified the Department of Treasury Bureau of Alcohol, Tobacco and Firearms transaction report admitted for purposes of this sentencing proceeding as Exhibit 108 in purchasing a firearm while a fugitive in Kansas City, Kansas. You did so with false identification under a false name, having been previously convicted of a crime. . . .
>
> When I consider the nature of the offenses in this case if this were a first-time offense, that would be one thing, but given the egregious prior criminal history in your case, the egregious nature of the offenses for which you stand convicted here becomes more apparent; that is that you are a recidivist, and that leads to the

-33-

concern about protection of the public, because as a recidivist I have no confidence that at any time in the future the public will be protected from your fraudulent conduct (emphasis added).

The district court concluded based on the record before it that Akers had a proven commitment to criminal enterprise that made rehabilitation improbable and recidivism exceptionally likely. Section 4A1.3 encourages departure where "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." § 4A1.3 (1998) (emphasis added). Given the record and the district court's special competence in assessing the uniqueness of a particular defendant's criminal history, we conclude that the district court did not abuse its discretion in finding Akers's criminal history sufficiently exceptional to warrant an upward departure. See, e.g., United States v. Bernhardt, 905 F.2d 343, 344-45 (10th Cir. 1990) (affirming an upward departure from Criminal History Category VI where the defendant, who had most recently been convicted of bank fraud, was a "career criminal" who "spent a lifetime defrauding people").

We turn now to the last two prongs of the departure analysis: whether the record sufficiently supports the factual basis underlying the departure and whether the degree of departure is reasonable. See Bartsma, 198 F.3d at 1195. The presentence report included a list of convictions dating back twenty years. The list began with a 1977 conviction for making and uttering an insufficient

-34-

funds check. The list included multiple convictions for escape, forgery, possession of forged instruments or counterfeit securities, and fraud by check or credit card. The list also included a 1989 conviction on two counts of bank fraud and a 1994 conviction for possession of forged instrument. We conclude that the presentence report and the testimony of the probation officer at the sentencing hearing linking Akers to each of the convictions in the report were an ample factual basis for the district court's conclusions regarding Akers's track record of criminal enterprise. See United States v. Shinault, 147 F.3d 1266, 1277-78 (10th Cir.), cert. denied, 525 U.S. 988, 119 S. Ct. 459 (1998) (noting that a sentencing court may rely on facts stated in the presentence report to the extent that the defendant has not objected to them and may rely on testimony of the probation officer who prepared the report as evidence to prove a contested conviction).

Finally, the method the district court used in this case to determine the degree of upward departure was reasonable. See Lowe, 106 F.3d at 1503 (holding that increasing the offense level by two levels was a reasonable method for determining the degree of upward departure after determining that an accurate representation of defendant's criminal history would have put him two categories above Criminal History Category VI, if such categories existed).

IV

Akers also argues that the district court erred in denying his motions to

recover seized property pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure. This court reviews for abuse of discretion a district court's finding that it lacked jurisdiction over a motion to compel the return of property under Rule 41(e). See Frazee v. Internal Revenue Serv., 947 F.2d 448, 449 (10th Cir. 1991). We find no abuse of discretion.

After Akers was returned to federal custody on January 17, 1997, he filed motions under Rule 41(e) on March 4, 1997, September 16, 1997, and October 29, 1997, seeking the return of the cash, traveler's checks, and money order that were seized incident to his arrest in the District of Kansas. On January 15, 1998, the seized property became the subject of a civil forfeiture action in the District of Kansas. The theory of that forfeiture action was that the property was involved in, or the proceeds of, an act of bank fraud that was not in issue in the prosecution in the District of Colorado that gave rise to this appeal. On August 10, 1998, the district court denied Akers's Rule 41(e) motions for lack of jurisdiction.

Rule 41(e) provides that "[a] person aggrieved by . . . the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property. Fed. R. Crim. P. 41(e) (emphasis added). Rule 41(e) is an equitable remedy available only to a defendant who can show

irreparable harm and an inadequate remedy at law.    See Clymore v. United States, 164 F.3d 569, 571 (10th Cir. 1999).

At the time the district court ruled on the Rule 41(e) motion, Akers told the court that he had filed a motion to dismiss the pending civil forfeiture action in the District of Kansas.  This court has held that a forfeiture proceeding provides a defendant with an adequate remedy at law for resolving a claim to seized property.   See Frazee, 947 F.2d at 449-50 ("That remedy is adequate because the legality of the seizure may be tested in a judicial forfeiture.").  There was no need, then, to graft a Rule 41(e) motion onto this criminal proceeding in order to assure the airing of Akers's claim of wrongful seizure.

Additionally, this court has held that, "at least in cases where the underlying criminal proceedings have concluded and the trial court no longer exercises any control over the subject property, the proper venue for a Rule 41(e) motion is the district in which the property was seized.  We see this interpretation as conforming more closely to the language of the rule and to the practicalities of judicial administration."    Clymore, 164 F.3d at 574-75.  Here, the district court denied Akers's Rule 41(e) motion on August 10, 1998, almost a year after Akers was convicted.  We recognize that sentencing had yet to take place at that time and that Akers first filed his Rule 41(e) motion several months before his conviction.  It appears from the record before us, however, that the

District of Colorado never had any control over the property Akers sought to recover. Cf. id. (noting that the prosecuting district is not a proper venue for a Rule 41(e) motion once the underlying criminal proceedings have concluded and the trial court "no longer exercises any control" over the property). We conclude that the district court did not abuse its discretion in denying Akers's Rule 41(e) motion for lack of jurisdiction.

Akers's argument that the district court could have exercised jurisdiction over the seized property pursuant to 28 U.S.C. § 1355 [3] and 18 U.S.C. § 981 [4] is without merit. First, no civil forfeiture action was filed in the District of Colorado. Second, the civil forfeiture action brought in the District of Kansas was unrelated to the criminal prosecution in the District of Colorado.

The judgment of conviction, the sentencing decision, and the order denying the Rule 41(e) motion are each AFFIRMED.

---

[3] Section 1355 provides, in pertinent part, that "[a] forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A).

[4] Section 981 provides, in pertinent part:
[I]n the case of property of a defendant charged with a violation that is the basis for forfeiture of the property under this section, a proceeding for forfeiture under this section may be brought in the judicial district in which the defendant owning such property is found or in the judicial district in which the criminal prosecution is brought.
18 U.S.C. § 981(h).