**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 9 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

STEPHEN RALPH PROFFIT,

      Defendant - Appellant.

No. 01-8065

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 99-CR-170-D)**

---

**Submitted on the briefs:[1]**

Tom Sedar, Casper, Wyoming, for Defendant-Appellant.

Matthew H. Mead, United States Attorney, and Lisa E. Leschuck, Assistant United States Attorney, District of Wyoming, Cheyenne, Wyoming, for Plaintiff-Appellee.

---

Before **KELLY**, **McKAY**, and **MURPHY**, Circuit Judges.

---

    [1] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

**McKAY**, Circuit Judge.

_____

Defendant Stephen Ralph Proffit appeals the sentence imposed by the United States District Court for the District of Wyoming following his guilty plea to a single count of mail fraud in violation of 18 U.S.C. §1341. Defendant maintains that the district court erred in enhancing his offense level for more than minimal planning, enhancing his offense level based on victim vulnerability, refusing to grant an adjustment for acceptance of responsibility, and increasing his sentence range through an upward departure in Defendant's criminal history from Category IV to Category V.

## I. Background

Allen Cook, owner of a large ranch with an estimated value in excess of twenty-five million dollars near Laramie, Wyoming, was diagnosed with non-Hodgkin's malignant lymphoma in August 1998. He did not know if the cancer was aggressive or non-aggressive. However, if the cancer proved aggressive, Mr. Cook was likely to pass away within a matter of months. In an attempt to prepare his estate, Mr. Cook decided to sell his ranch. In November 1998, he advertised his intent in a publication entitled the "Robb Report."

Posing as a wealthy rancher, Defendant responded to Mr. Cook's advertisement in December 1998 and expressed his interest in purchasing the

ranch. In reality, Defendant had just completed a three-year period of supervised release following a two-year prison sentence for fraud.

During one of a series of phone calls in which Mr. Cook and the Defendant discussed the proposed purchase of the ranch, Mr. Cook revealed that he was selling the ranch because of his medical diagnosis. Defendant represented to Mr. Cook that he too had suffered severe physical ailments and offered his contacts with a doctor in New York who could possibly assist Mr. Cook with his medical problems. During the conversations, Defendant also displayed vast knowledge of the ranching industry.

After a series of phone calls, Defendant visited Mr. Cook under the auspices of purchasing the ranch. During his visit, Defendant made several false representations regarding his trading abilities in cattle futures. Defendant requested that Mr. Cook give him $500,000 to invest in cattle futures. Mr. Cook refused Defendant's initial request, but eventually sent Defendant $50,000 to be invested in cattle futures on his behalf. Defendant concedes that he never invested the funds as promised, using the money instead for personal expenses. At all times Mr. Cook retained ownership of the ranch.

On December 20, 2000, Defendant entered into a plea agreement. On January 10, 2001, the district court held a hearing concerning Defendant's motion for a continuance to his change of plea hearing. Defendant claimed that he was

undergoing surgery and produced "evidence" of the pending surgery at the January 10, 2001, hearing. The district judge eventually determined that Defendant had fabricated the medical documentation he supplied in support of his motion for a continuance.

The district court conducted the first phase of sentencing on May 14, 2001. At that time, the district court notified both parties of its intent to consider several enhancements to Defendant's offense level as well as a possible upward departure. During the second phase of sentencing on July 18, 2001, the court determined that Defendant's offense level merited enhancement for the following reasons: the crime involved a vulnerable victim, Defendant had obstructed justice, and Defendant's crime involved more than minimal planning.

The district court also determined that Defendant was not entitled to a decrease in his offense level for acceptance of responsibility and decided that an upward departure from criminal history Category IV to Category V was appropriate because Category V more accurately reflected the seriousness of Defendant's criminal history. This resulted in a Guidelines range of 46-57 months' imprisonment. The district court sentenced Defendant to fifty-two months' imprisonment. Defendant now challenges the district court's enhancement of his offense level for more than minimal planning, enhancement of his offense level for a crime involving a vulnerable victim, refusal to grant a

downward adjustment for acceptance of responsibility, and upward departure from criminal history Category IV to Category V.

## II.  More Than Minimal Planning

The Guidelines in force at the time of Defendant's sentencing provide for a two-point enhancement for crimes involving more than minimal planning. Section 2F1.1(b)(2) states "[i]f the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim, increase by 2 levels." Because Mr. Cook is the only victim, the court granted the increase based on more than minimal planning.  The district court's decision to enhance Defendant's offense level for more than minimal planning is subject to review for clear error. United States v. Lambert, 995 F.2d 1006, 1008 (10th Cir. 1993) (factual findings subject to clear error review, interpretation of the Guidelines reviewed de novo).

The Guidelines Application Notes identify three groups of activities that merit an enhancement for more than minimal planning.  In order to justify an enhancement for more than minimal planning, the district court must show that 1) Defendant took "significant affirmative steps . . . to conceal the offense other than conduct" prohibited under the Guidelines' provisions for the obstruction of justice enhancement, or 2) Defendant engaged in "repeated acts over a period of time," or 3) Defendant's crime evidenced "more planning than is typical for commission of the offense in a simple form."  U.S. Sentencing Guidelines

Manual §1B1.1(f) (2000) (defining more than minimal planning); see, e.g., United States v. Copus, 110 F.3d 1529, 1537 (10th Cir. 1997).

The district court justified its decision to enhance Defendant's offense level for more than minimal planning as follows:

> This offense clearly involved more than minimal planning. In fact, it was a highly sophisticated, detailed, extended effort at mail fraud. Pursuant to 2F1.1(b)(2), the Court can increase the offense levels if the record reflects repeated acts over an extended period of time and thereafter considered efforts to conceal those activities. I think all of that occurred here. A two-level increase is, therefore, appropriate for that as well.

Rec., Vol. IX, at 57.

It is unclear what "significant affirmative acts" to conceal Defendant's offense the district court relied upon in reaching its conclusion. Defendant's attempts to avoid sentencing by supplying fraudulent documents to the court cannot justify the court's decision to enhance for more than minimal planning because that conduct provides a basis for an enhancement based on obstruction of justice. See U.S.S.G. §3C1.1 (minimal planning does not include affirmative acts of concealment qualifying as obstruction of justice). The district court failed to set forth any other significant affirmative acts that Defendant took to conceal his crime. Thus, the district court's findings are insufficient to support its enhancement based on significant affirmative acts of concealment.

The district court also cites Defendant's repeated acts to justify its decision

to enhance for more than minimum planning. The court misconstrues the intent of the language "repeated acts over a period of time." A review of our prior decisions indicates that the notion of repeated acts refers to a series of acts each of which would be criminal standing alone, rather than referring to a crime that requires the completion of a series of steps. See, e.g., United States v. Allen, 129 F.3d 1159, 1166 (10th Cir. 1997) (multiple acts of embezzlement); United States v. Orr, 68 F.3d 1247, 1253 (10th Cir. 1995) (depositing 298 checks as part of a check kiting scheme); United States v. Rice, 52 F.3d 843, 850 (10th Cir. 1995) (filing fraudulent tax returns for several years); United States v. Wise, 990 F.2d 1545, 1550-51 (10th Cir. 1992) (execution of five notes and twelve draw letters over two and one-half years to defraud bank); United States v. Abud-Sanchez, 973 F.2d 835, 837 (10th Cir. 1992) (submission of multiple fraudulent invoices to multiple health benefit providers); United States v. Lee, 973 F.2d 832, 833 (10th Cir. 1992) (five separate cases of embezzlement); United States v. Williams, 966 F.2d 555, 558-59 (10th Cir. 1992) (repeated acts of embezzlement); United States v. Sanchez, 914 F.2d 206, 207 (10th Cir. 1990) (using a stolen credit card fifteen times). The district court's statement that "the record reflects repeated acts over an extended period of time" is insufficient for a finding of minimal planning. Rec., Vol. IX, at 57. Without setting forth the series of acts, each of which would be criminal standing alone, we are unable to affirm the district court's

enhancement decision for more than minimal planning based on repeated acts.

The third basis on which the decision to enhance for more than minimal planning may be upheld is evidence that Defendant's crime required "more planning than is typical for commission of *the offense* in a simple form." U.S.S.G. §1B1.1(f) (emphasis added). Defendant pleaded guilty to a single violation of 18 U.S.C. §1341. He was sentenced pursuant to Guideline §2F1.1(b)(1)(G) for fraud and deceit involving more than $40,000 but less than $70,000. Thus, the proper inquiry is whether Defendant's actions demonstrated a greater amount of planning than required to defraud an individual of between $40,000-$70,000 in a simple manner.

In this case, the success of Defendant's scheme to defraud depended upon his ability to successfully ingratiate himself to Mr. Cook. This required several contacts by phone, flying to Denver to meet Mr. Cook, renting a car to drive from Denver to Wyoming, development and use of false stories concerning his success in trading cattle futures, and several requests for money culminating in the receipt of Mr. Cook's check. Taken together, these actions show a level of planning in excess of the amount of planning required to commit mail fraud of $40,000-$70,000 in its simple form. See, e.g., United States v. Levinson, 56 F.3d 780, 782 (7th Cir. 1995) (inflating an otherwise valid insurance claim is an example of mail fraud in its simple form). Accordingly, we affirm the district court's

decision to enhance Defendant's sentence for more than minimal planning.

### III. Vulnerable Victim

Defendant also challenges the district court's decision to enhance his offense level by two points because his crime involved a vulnerable victim. Section 3A1.1(b)(1) allows an enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim . . . ." We have previously held that it is not a prerequisite that a defendant be aware of the victim's vulnerability at the time the defendant targets the victim; learning about the vulnerability during the criminal episode is sufficient. See United States v. Hardesty, 105 F.3d 558, 560 (10th Cir. 1997).

The concept of "vulnerability" under the Guidelines is potentially confusing. Success of all fraudulent schemes depends in some measure on a victim's vulnerability, and perpetrators of fraud routinely target vulnerable individuals. The Guidelines' enhancement, however, is reserved for exceptional cases in which the victim is *unusually* vulnerable or *particularly susceptible* to the crime committed. See, e.g., United States v. Smith, 930 F.2d 1450, 1455 (10th Cir. 1991) (rejecting enhancement because fact woman victim was elderly alone was insufficient to justify vulnerable victim enhancement). "Vulnerable victims" are individuals unable to protect themselves who therefore require greater societal protection. See, e.g., United States v. Shumway, 112 F.3d 1413,

1422-24 (10th Cir. 1997). Membership in a class of individuals considered more vulnerable than the average individual is insufficient standing alone. See United States v. Tissnolthtos, 115 F.3d 759, 761-62 (10th Cir. 1997) (rejecting enhancement based on advanced age alone); Lee, 973 F.2d at 833-34 (same); Smith, 930 F.2d at 1455 (same); United States v. Creech, 913 F.2d 780, 781-82 (10th Cir. 1990) (rejecting enhancement because newlyweds as a class did not qualify as vulnerable victims).

During sentencing, the district court made the following statement justifying its decision to enhance Defendant's offense level for vulnerability of the victim:

> One thing that has been established, based on my ability to assess Mr. Cook's testimony both in May and now, is that while he is normally to be considered a sophisticated businessman and while he impresses me as being a rugged individual who's not usually subject to vulnerability, it is clear, from listening to him and watching his face and seeing the impact that this story has on him just in retelling it, that he was, at the time of this defendant's crime, clearly a vulnerable individual.
>
> He was given a diagnosis that has an uncertain future and, in its most aggressive form, has a very high degree of lethality. In a frame of mind that bordered on panic, he looked in directions that probably he shouldn't have looked and wouldn't have, had he had his wits about him, but he clearly did not.
>
> This defendant had a full opportunity to assess the vulnerability of his prey. He stalked his prey like a mountain lion would stock [sic] one of Mr. Cook's calves. He knew early on of his health problems, even suggesting where he might find medical treatment. Perhaps a defendant with an ounce of due passion would have said, "Enough is

-10-

enough; I'll find another." But instead, he used that to further his aims.

Clearly that is why the sentencing commission has adopted 3A1.1(b)(1), and clearly this victim-related adjustment is appropriate, given all the factual matters which have been presented to me.

Rec., Vol. IX, at 57-58.

It is uncontroverted that Mr. Cook is a successful businessman who built a multi-million dollar ranch from the ground up. To be successful in the ranching industry requires tremendous intellect, skill, hard work, and determination. Mr. Cook is familiar with complex financial transactions and had previously invested in the cattle futures market. He also employed legal counsel to assist in the drafting of contracts for the potential sale of his ranch and took legal counsel with him while meeting with a firm that specialized in estate planning after his medical diagnosis. In short, Mr. Cook is a sophisticated and successful businessman.

It is also uncontroverted that Mr. Cook received devastating news regarding his health. Facing the possibility of a premature death is daunting. Such news causes many individuals to reconsider their current course of conduct. Mr. Cook's response to the news is understandable. He attempted to take steps to put his financial affairs in order and limit any potential negative consequences to his family should he pass away.

Without question, Mr. Cook's illness prompted him to look for a buyer for his ranch. In that sense, Mr. Cook's illness may have opened the door for

Defendant's criminal conduct because it allowed Defendant the opportunity to approach him under the guise of an interested buyer. Like any effective con man, Defendant used Mr. Cook's illness to ingratiate himself with Mr. Cook by feigning empathy and offering to help him by recommending a medical specialist. It is important to note, however, that Defendant did not fraudulently deprive Mr. Cook of ranch ownership, nor did he ever attempt to do so. Portraying an interest in purchasing the ranch was the guise that allowed Defendant to approach Mr. Cook about investing in cattle futures.

We believe that the district court's decision to enhance Defendant's offense level for vulnerable victim was clearly erroneous. The district court's reasoning is devoid of sufficient information demonstrating that Mr. Cook was particularly vulnerable or in need of greater societal protection. We do not dispute his illness or the grave effect the news of his illness had upon him. But, allowing a vulnerable victim enhancement based on illness alone would suggest that sick individuals as a group qualify as "vulnerable victims." Our prior cases reject the granting of vulnerable victim status to members of a group. See, e.g., Tissnolthtos, 115 F.3d at 761-62. Mr. Cook possessed several self-defense mechanisms which he used while making other decisions at the same time Defendant defrauded him. For example, Mr. Cook had a lawyer accompany him on a trip to discuss his estate with a firm specializing in overseas investment. He

-12-

also used an attorney to draft several proposed contracts for the sale of his ranch. He could have used these same mechanisms to detect Defendant's fraud. Mr. Cook could have used these resources and knowledge to employ counsel in his decision to invest or to investigate Defendant's background.

We might have reached a different conclusion if Defendant had defrauded Mr. Cook of his ranch after discovering Mr. Cook was ill and wished to sell it. In that circumstance, the correlation between Mr. Cook's health, his decision to sell the ranch, and Defendant's ability to defraud him of ranch ownership would be direct. However, we must focus on the fraud actually committed–the "investment" in cattle futures. The link between Mr. Cook's illness and Defendant's success in defrauding him is indirect. Mr. Cook's illness led to his decision to sell the ranch. This, in turn, allowed Defendant to meet Mr. Cook and encourage him to send Defendant money for an "investment" in cattle futures. There is no direct correlation between Mr. Cook's illness and his decision to invest in cattle futures in the present case.

Mr. Cook's decision to invest appears to be based on the very same reasons that the majority of those who fall victim to investment scams have–the lure of a substantial return on an investment in a relatively short period of time. This lure has caused many to make decisions atypical of their general approach to financial matters.

-13-

The vulnerable victim enhancement inquiry must remain focused on the victim's status. In this case, we hold that the evidence presented to the district court is insufficient to demonstrate that Mr. Cook was particularly vulnerable to Defendant's scam. We reverse the district court's decision to enhance Defendant's offense level for victim vulnerability.

## IV. Acceptance of Responsibility

Defendant next challenges the district court's refusal to grant him credit for acceptance of responsibility. The district court's decision is subject to clearly erroneous review. See United States v. Mitchell, 113 F.3d 1528, 1533 (10th Cir. 1997). Defendant bears the burden of proving entitlement to an adjustment for acceptance of responsibility. See United States v. Wach, 907 F.2d 1038, 1040 (10th Cir. 1990).

Guideline § 3E1.1(a) states that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." In addition, the commentary to this section indicates that "[c]onduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. §3E1.1(a) Commentary Note 4. The Guidelines do envision extraordinary cases where a defendant could receive an adjustment for acceptance of responsibility despite also receiving an

enhancement for obstruction of justice. See id.; see also United States v. Archuletta, 231 F.3d 682, 686 (10th Cir. 2000) (recognizing exception for extraordinary cases but holding that defendant's case was not extraordinary).

Defendant faces a daunting task. He must clear the difficult hurdle of clearly erroneous review and demonstrate that his case is an exceptional one which justifies the grant of an acceptance of responsibility adjustment despite the enhancement for obstruction of justice. Research of our published cases failed to reveal a single instance where we have overturned a district court's denial of acceptance of responsibility. The district court judge "is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. §3E1.1, application note 5.

Defendant concedes that his conduct warrants an enhancement for obstruction of justice. We have continually upheld a district court's refusal to grant an acceptance of responsibility adjustment where the defendant's actions merited an enhancement for obstruction of justice. See, e.g., Archuletta, 231 F.3d at 686; United States v. Lindsay, 184 F.3d 1138, 1143-44 (10th Cir. 1999); United States v. Hawley, 93 F.3d 682, 688-90 (10th Cir. 1996); United States v. Nelson, 54 F.3d 1540, 1544-45 (10th Cir. 1995); United States v. Fetherolf, 21 F.3d 998, 1001 (10th Cir. 1994); United States v. Tovar, 27 F.3d 497, 499 (10th Cir. 1994); United States v. Amos, 984 F.2d 1067, 1072-73 (10th Cir. 1993).

Defendant has presented no evidence proving that his case is exceptional enough to warrant a rarely granted deviation from the Guidelines' explicit provisions. We affirm the district court's denial of an adjustment to Defendant for acceptance of responsibility.

## V. Upward Departure

In addition to enhancing Defendant's offense level, the district court determined that Category V better represented Defendant's criminal history than Category IV. Accordingly, the district court added two criminal history points to Defendant's criminal history. By adding two criminal history points, Defendant's criminal history was calculated as Category V. We review the district court's decision to upwardly depart "under a unitary abuse-of-discretion standard which 'includes review to determine that the discretion [of the district court] was not guided by erroneous legal conclusions.'" United States v. Hanson, 264 F.3d 988, 994 (10th Cir. 2001) (quotations and citations omitted). Departure decisions resting on factual considerations are "entitled to substantial deference." Id.; United States v. Fortier, 242 F.3d 1224, 1232 (10th Cir. 2001).

"We consider four factors in reviewing the propriety of a district court's upward departure from the Guidelines." United States v. Walker, 284 F.3d 1169, 1171 (10th Cir. 2002) (citation omitted). They are: "(1) whether the factual circumstances supporting a departure are permissible departure factors;

(2) whether the departure factors relied upon by the district court remove the

defendant from the applicable Guideline heartland thus warranting a departure;

(3) whether the record sufficiently supports the factual basis underlying the

departure; and (4) whether the degree of departure is reasonable." United States

v. Collins, 122 F.3d 1297, 1303 (10th Cir. 1997).

The district court justified its decision to depart as follows:

The Court will upward-depart on criminal history based on the
inadequacy of the criminal history score. The departure is based on a
combination of factors relating to the inadequacy of his criminal
history. Those factors include, as I indicated . . . the [prior] offense
involved fraudulent acts in that offense of 13 separate victims. The
details of the crime outlined in that paragraph are virtually a mirror
image of the present offense in this case. Couple all of that with the
fact that the defendant failed to pay the court-imposed special
assessment which is mandatory for the conviction of any felony
offense or restitution obligations indicates to this Court his increased
likelihood of recidivism.

Additionally, while on supervised release, as I indicated earlier, he
opened numerous accounts of credit with virtually no means of
paying them off, accumulating debt approaching $40,000, filing
bankruptcy on the debt which, as far as I'm concerned, establishes a
civil record of his ongoing financial irresponsibility.

As I alluded to it earlier, in addition, while on pretrial supervision,
he's written three insufficient-funds checks resulting in misdemeanor
charges in another jurisdiction . . . and those charges remain pending
as of the present hour, and he has not been given any criminal history
points for that at all.

Guideline 4A1.3 indicates that if reliable information indicates the
criminal history category does not adequately reflect the seriousness
of the defendant's past criminal conduct or the likelihood that the
defendant will commit other crimes, the Court may consider

-17-

imposing a sentence departing from the otherwise applicable
guideline range.  Such information may include, but is not limited to,
information concerning, B, prior sentences of substantially more than
one year imposed as a result of independent crimes committed on
different occasions; C, prior similar misconduct established by civil
adjudication or by failure to comply with an administrative order; E,
prior similar adult criminal conduct resulting in criminal conviction.

. . . .

The [Akers] Court saw that [] proof of a commitment to criminal
enterprise [] made rehabilitation improbable and recidivism
exceptionally likely.  The Court thinks that in this case the reasons I
have articulated demonstrate amply a justification for such a
departure.

Based on these factors, it is determined that the criminal history of
V, Roman Numeral V, rather than IV as reported in the presentence
investigation report, more accurately reflects the serious nature of the
defendant's past conduct and the likelihood that he will commit
future crimes of this nature.  Based on that criminal history, the
Court finds it's not a question of "if" this defendant will re-offend; it
is merely a question of "when."

Rec., Vol. IX, 60-63.

We first review the departure factors the district court used in its decision

to upwardly depart to determine whether those factors are permissible departure

factors.  United States v. Whiteskunk, 162 F.3d 1244, 1249 (10th Cir. 1998).  The

district court justified its decision to upwardly depart on at least five grounds.

Those grounds were:  Defendant's prior fraud sentence in excess of one year

imprisonment, Defendant's declaration of bankruptcy for debts incurred without

any ability to repay them, prior similar misconduct, subsequent misdemeanor bad

-18-

check charges that had not been considered in establishing Defendant's criminal history, and Defendant's potential for recidivism.

Only one of the factors used by the district court can possibly be challenged as improper. The district court took the position that Defendant's bankruptcy declaration involving debts that he never had the ability to pay in the first instance qualified as prior similar misconduct established by civil adjudication. We seriously doubt the propriety of the district court's application of the Guidelines in this instance. Likely, this reason for departure would be applicable if Defendant had been sued civilly for bankruptcy fraud or had his bankruptcy petition rejected because of his alleged fraudulent activities. For purpose of analysis, we assume without deciding that the district court's reliance on this factor was improper.

Regardless, "[i]f the sentencing decision rested on other permissible factors in addition to the improper factor, and we determine the district [court] would have imposed the same sentence even in the absence of the improper factor, then we will not disturb the decision." Id. at 1250 (citation omitted). At least four of the five factors the court relied upon are valid departure factors. Because we believe the district court would have imposed the same sentence without considering Defendant's bankruptcy proceeding, we hold that the district court relied on permissible factors in deciding to depart. See Koon v. United States,

518 U.S. 81, 113 (1996) (court should remand district court's decision to upwardly depart based upon valid and invalid factors unless it determines district court would have imposed same sentence without considering the invalid factors).

We next consider whether the departure factors the district court relied upon removed the Defendant from the applicable Guideline heartland. The district court's finding "is entitled to substantial deference." Walker, 284 F.3d at 1172. We limit our review to determining whether "the factual circumstances from the vantage point of the district court make this the atypical case." Collins, 112 F.3d at 1303 (quotation omitted). "If the case is a typical one, the 'court must impose a sentence within the applicable Sentencing Guidelines range.'" Whiteskunk, 162 F.3d at 1252 (quotations omitted).

The district court relied heavily upon Defendant's prior fraud conviction entailing a scheme similar to the one in the instant case where Defendant defrauded eighteen individuals of $160,000. Additionally, Defendant's failure to pay any restitution or the special assessment, his passing of bad checks after being indicted in the present case, and submission of false medical documentation in an attempt to delay sentencing all evidence Defendant's potential for recidivism. These circumstances led the district court to the conclusion that Defendant's past conduct and his potential for recidivism were atypical of defendants with Category IV criminal histories.

Defendant insists that he is merely representative of the typical fraud defendant and that "you can't beat a dog for being a dog." Rec., Vol. IX, at 45. Defendant misunderstands the nature of the Guidelines. Because Defendant's prior conduct was extremely similar to the crime he is currently being sentenced for and because he evidences a potential of recidivism atypical of other criminal defendants within his criminal history category, he merits an upward adjustment to his criminal history category. The district court did not abuse its discretion when it determined that "Defendant's criminal history [was] sufficiently exceptional to remove it from the 'heartland' of criminal history category" IV. Walker, 284 F.3d at 1172.

The third step is to determine "whether the record sufficiently supports the factual basis underlying the departure." Collins, 122 F.3d at 1303. The record is replete with evidence supporting the district court's findings. Thus, we hold that the factual basis for upward departure cited by the district court is sufficiently supported in the record.

The final step is to determine whether the district court's degree of departure was reasonable. "Articulation of the factual basis for upwardly departing 'does not automatically suffice to explain the degree of departure.'" Walker, 284 F.3d at 1172 (quoting Whiteskunk, 162 F.3d at 1253). Simply restating the justification for upward departure "does not fulfill the separate

requirement of stating the reasons for imposing the particular sentence." United States v. Flinn, 987 F.2d 1497, 1502 (10th Cir. 1993). The district court is required to "precisely lay out [its] reasoning and analysis as to why [it is selecting] a particular degree of departure." United States v. Bartsma, 198 F.3d 1191, 1197 (10th Cir. 1999). This reasoning and analysis must give us "reasonable indicia that the sentence [the district court pronounces] is proportional to the crime committed." United States v. Kalady, 941 F.2d 1090, 1101 (10th Cir. 1991). The district court accomplishes this task by using any "reasonable methodology hitched to the Sentencing Guidelines to justify the reasonableness of the departure." United States v. Harris, 907 F.2d 121, 124 (10th Cir. 1990).

The district court summarized its decision to depart by stating, "[I]t is determined that the criminal history of V, Roman Number V, rather than IV as reported in the presentence investigation report, more accurately reflects the serious nature of the defendant's past conduct and the likelihood that he will commit future crimes of this nature." Rec., Vol. IX, at 62. Typically, this reasoning is insufficient because it simply restates the reasons justifying the decision to upwardly depart in the first instance. We have consistently rejected similar statements as insufficient to satisfy the reasonableness of departure requirement. See, e.g., Bartsma, 198 F.3d at 1197; United States v. Okane, 52

-22-

F.3d 828, 836 (10th Cir. 1995); United States v. Yates, 22 F.3d 981, 991 (10th Cir. 1994); Flinn, 987 F.2d at 1503.

We typically require a more reasoned explanation justifying the sentence the district court imposes instead of the Guidelines' sentence. It is true that district judges have not been "reduced to being scriveners in the role of sentencing." Rec., Vol. IX, at 65. However, district courts deciding to upwardly depart in extraordinary cases must show that their level of departure is reasonable. Without a reasoned analysis of the district court's degree of departure, the Guidelines' goals of uniformity and proportionality are lost. See United States v. Gardner, 905 F.2d 1432, 1436-39 (10th Cir. 1990) (Guidelines require uniformity and proportionality even in decisions to upwardly depart).

However, a reasoned explanation is not necessary in this particular case. The district court relied upon permissible departure factors, those permissible factors removed Defendant from the Guidelines' heartland, and the record sufficiently supported the factual basis underlying the departure. The district court's departure from Category IV to Category V represents the smallest possible departure the district court could have made. Having held that the district court properly used its discretion to depart, no justification is required from the district court when it elects the smallest possible departure. In this narrow circumstance, a reasoned explanation detailing why the district court selected the sentence

imposed justified by a methodology reasonably hitched to the Guidelines is unnecessary. Accordingly, we affirm the district court's decision to upwardly depart.

## VI. Conclusion

We affirm the district court's enhancement of Defendant's sentence for more than minimal planning, its denial of an acceptance of responsibility adjustment, and its decision to upwardly depart. We reverse the district court's decision to enhance for vulnerable victim. We remand to the district court for resentencing in a manner consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**