**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 29 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROBERT DANA GANGI, also know as
Matthew Gangi, Robert Dana Gangis,
Matthew R. Gangi, Robert R. Gangis and
Michael Dana Gangi,

Defendant - Appellant.

No. 01-8070
D.C. No. 00-CR-148-J
(D. Wyoming)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **PORFILIO**, and **LUCERO**, Circuit Judges.

This appeal arises from what the government dubs a "stunning case," another

episode in the unique criminal career accumulated by Robert Dana Gangi. From his latest

conviction for bank fraud under 18 U.S.C. § 1344(2), Mr. Gangi appeals the denial of his

motion to suppress taped telephone conversations and four increases added to his base

offense level, resulting in a sentence of 120 months. Finding no error, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

Though the factual background here is intriguing, when set against Mr. Gangi's thirty year history of flounting the law, it is, indeed, "stunning." On July 6, 2000, Evanston, Wyoming police arrested Mr. Gangi, who was driving a late-model Corvette stolen from a dealership in Menlo Park, California. Booked into the Uinta County Detention Center (Jail), Mr. Gangi was charged with possession of stolen property and placed in a cell in an area of the Jail known as Pod B. A $10,000 bond was set.

In Pod B, there are black telephones for inmate use. Above each phone is a sign informing inmates any calls made on these black phones are recorded. Another sign tells inmates to use gray telephones to call their attorneys, and, at the inmate's request, the calls will not be recorded. All telephone calls made on the inmate phone system are collect calls. Recipients hear a recorded message stating, to accept a collect call from an inmate at the Jail, press 1 on the keypad. All calls, except those made to attorneys, are tape recorded on an automatic taping system in the Sheriff's office at the Jail.

After he complained of chest pains, Mr Gangi was transferred to the regional hospital. Upon his return, Jail personnel placed Mr. Gangi in Med Cell 1 to monitor his medical status. There, two black telephones in the 72-hour inmate holding area adjacent to Mr. Gangi's cell were available for inmate use. At that time, no signs were posted above these phones.

On the afternoon of his return, July 10, Mr. Gangi, the only inmate in the area, called the First National Bank of Evanston (Bank). Mr. Gangi told the receptionist who

accepted the call he was David Madia, the owner of an Evanston auto dealership and a member of the bank's board of directors, and wanted to speak to the head teller. Instead, the receptionist transferred the call to an available teller, informing her David Madia was on the phone. Mr. Gangi told the teller his nephew, Robert Gangi, was in jail and instructed her to withdraw $10,000 from his business account for a cashier's check for his bond and to make it payable to the Uinta County District Court. Mr. Gangi called the bank again, and, identifying himself as Dave Madia, told the teller to deliver the certified check to the Jail instead of the court. The check arrived at the Jail later that afternoon.

As Mr. Gangi signed for his personal property, poised to "book out," Sheriff Jack Holts received a call from a Menlo Park, California police officer, who requested a hold on the prisoner while they faxed an arrest warrant sporting a $200,000 bond. Escorted back to his cell, Mr. Gangi called Spence, Moriarity and Schuster, a Jackson, Wyoming law firm, identifying himself as John Moores, the owner of the San Diego Padres. Mr. Gangi asked the receptionist to call the Jail and find out why his son-in-law had not been released as promised. Using his own name, Mr. Gangi then called back; he told a paralegal he had talked to John Moores and simply wanted the firm to call the Jail to assist in his release. The paralegal informed Mr. Gangi she did not think anyone there could help him under these unusual circumstances. The Menlo Park arrest warrant arrived. Mr. Gangi was now faced with a $200,000 bond.

Undaunted, Mr. Gangi again called the Bank, and, identifying himself as Dave Madia, followed the same script, requesting a $200,000 withdrawal to satisfy an increase in his nephew's bail. Too busy to process the request, the head teller called a loan officer, who found the transaction "highly suspicious" and telephoned Dave Madia's wife. She confirmed they had no wayward nephew, aborting the issuance of the second check.

Federal officials then charged Mr. Gangi with bank fraud under 18 U.S.C. § 1344(2) and transferred him to the Laramie County Detention Center (Center). While awaiting trial, a Center employee discovered a note attached to Mr. Gangi's charging documents, which happened to be left on the book-in area counter. The note stated Mr. Gangi's family had posted bail, and he would be released at 8:00 p.m. that night. Later, at the Federal Medical Center in Fort Worth, Texas, the medical staff found a handwritten notation in Mr. Gangi's chart ordering his transfer to a private hospital for a series of tests and treatment.

Mr. Gangi filed a pretrial motion to suppress the tapes of his telephone calls to the Bank, the Spence law firm, and the Uinta County Public Defender. He alleged the tapes violated his Fourth Amendment rights, Title III of the Crime Control and Safe Streets Act, 18 U.S.C. § 2510 - 2521 (Title III), and, in part, were protected by the attorney-client privilege. After a hearing, the court suppressed the tapes of Mr. Gangi's calls to the Public Defender's Office but denied suppression of the remaining tapes under the crime-fraud exception of Title III.

A jury convicted Mr. Gangi of the single count of bank fraud. Adopting the PSR's findings and recommendations, and after a hearing to address objections, the court increased the base offense level by eight levels under U.S.S.G. § 2F1.1(b)(1)(I), rejecting the contention that no loss occurred, and finding, instead, that Mr. Gangi intended to inflict a loss of $210,000 on the Bank. The court then added two levels under U.S.S.G. § 2F1.1(b)(2) based on more than minimal planning and another two levels under U.S.S.G. § 3C1.1, upon finding Mr. Gangi obstructed justice by removing himself to a "more escape-friendly hospital setting" and attempting to escape. Finally, describing Mr. Gangi's thirty-year criminal history as unique, severe, and exceptional, the court assessed a 12 percent increase to eight categories. This formula produced an offense level of 26 and translated into a criminal history category of VI with a guideline range of 120 to 150 months. For that method, the court relied on *United States v. Akers*, 215 F.3d 1089 (10th Cir. 2000); *United States v. Bartsma*, 198 F.3d 1191 (10th Cir. 1999); and *United States v. Lowe*, 106 F.3d 1498 (10th Cir. 1997). The court then imposed a 120-month sentence, followed by five years of supervised release. Mr. Gangi appeals each of these increases and the denial of his motion to suppress.

### I. Motion to Suppress

Mr. Gangi attacks the denial of his motion to suppress the taped telephone calls he made on July 10 to the Bank and Spence law firm under the Fourth Amendment and the law enforcement exception to Title III. Lack of consent stemming from the absence of

any notice of the telephone monitoring system predicates both his arguments. Because there was no evidence of his consent, he maintains Title III's exceptions are unavailable and the intrusion on his privacy under the Fourth Amendment is unreasonable.

In our review of the denial of a motion to suppress, viewing the evidence in the light most favorable to the government, we accept the district court's factual findings unless they are clearly erroneous and review questions of law involving the proper application and construction of a statute de novo. *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999) (citations omitted). "Keeping in mind that the burden is on the defendant to prove that the challenged seizure was illegal under the Fourth Amendment, the ultimate determination of reasonableness . . . is a question of law reviewable de novo." *Id.*

The district court found that signs reading "Black Phones," under which appeared the notice, "All calls recorded," were present above all the telephones in Pod B, where Mr. Gangi was held from July 6 through 9. Next to these phones are gray telephones without a dialing mechanism and topped with signs stating, "Gray Phones," "Attorney calls only upon request not recorded." Telephones in the holding cell, used by inmates in the isolated medical cell, did not have these signs above them.[1] Correctional Communications Services owns all of the black phones. A Stancil recording machine

---

[1] Lieutenant David Evins of the Uinta County Sheriff's Department testified the signs were taken down when that area was painted.

records all incoming and outgoing calls made on each of these eight telephones in the pods and holding cell, and those calls are eventually stored on a digital data tape.

Based on these facts, the court concluded the law enforcement exception under 18 U.S.C. § 2511(2)(c)[2] permitted disclosure of Mr. Gangi's taped calls. Acknowledging those cases which found implied consent, *see, e.g.,* **United States v. Horr**, 963 F.2d 1124, 1126 (8th Cir. 1992), the court, however, stated, "neither the government nor does this Court wish to in this case rely on the signs or find that this is a consent type of situation. There was no sign posted over the black telephone located in the holding area . . . and there was no notice given in the portions of the handout that was given to Mr. Gangi." Based on the testimony of Lieutenant Evins and Joseph Casper, the Uinta County communications systems manager, the court determined the calls occurred within the

_____

[2] 18 U.S.C. § 2511(2)(c) provides:
> (c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2510 defines these terms:
> (5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than–
> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic for connection to the facilities of such service and used in the ordinary course of its business; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties. . . .

Jail's uniform practice of monitoring and taping all calls on the Stancil machine. That uniform practice, the court held, fell within the law enforcement exception of Title III and obviated the need for Jail authorities to make an individualized determination of reasonable suspicion on each call.

The Tenth Circuit has not addressed the question whether the law enforcement exception of Title III applies to routine taping of inmate calls by correctional officials.[3] The Ninth Circuit has, and we follow its reasoning and conclusion.

In *United States v. Van Poyck*, 77 F.3d 285 (9th Cir. 1996), defendant was arrested and transferred to a federal detention center from which he telephoned friends and made incriminating statements. The detention center taped and selectively monitored all inmate telephone conversations and required all inmates upon arrival to sign a form consenting to that system. Above the telephones were signs informing inmates their conversations would be monitored and "use of institutional telephones constitutes consent

---

[3] In an unpublished order, *United States v. Kalyvas*, Nos. 96-5176, 96-5144, WL 651761 at *6 (10th Cir. Oct. 21, 1997), the trial court denied defendant's motion to suppress tape recordings of his telephone conversations made from a Texas prison because the inmate impliedly consented to having the calls monitored. Defendant conceded the issue of consent but argued the Title III exception should not apply because the monitoring was "not 'random.'" *Id.* We affirmed without discussion, upon finding that the monitoring properly escalated when the calls became more frequent. We relied on *United States v. Feekes*, 879 F.2d 1562,1565 (7th Cir. 1989); *United States v. Amen*, 831 F.2d 373, 379 (2d Cir. 1987), and *United States v. Paul*, 614 F.2d 115 (6th Cir. 1980).

to this monitoring." *Id.* at 287. Prosecutors used the tapes at defendant's trial over his Fourth Amendment and Title III objections, prompting his appeal.

First, the Ninth Circuit concluded that two exceptions to Title III permitted the taping of inmate calls. Section 2510(5)(a) excludes "any telephone or telegraph instrument, equipment or facility, or any component thereof . . . being used by . . . an investigative or law enforcement officer *in the ordinary course of his duties*" from the definition of "electronic, mechanical, or other device" in Title III. 18 U.S.C. § 2510(5)(a). The court found the detention center is a law enforcement agency that routinely tapes all outbound inmate calls. Given that circumstance, "interception of these calls would appear to be in the ordinary course of their duties," *id.* at 292, and, therefore, "the law enforcement exception applies in this Circuit to [the] routine taping policy." *Id.*

A second exception under § 2511(2)(c), "prior consent to such interception," was also satisfied in the court's view. "Consent may be express or may be implied in fact from 'surrounding circumstances indicating that the [defendant] knowingly agreed to the surveillance.'" *Id.*, (*citing Amen*, 831 F.2d at 378). Citing the evidence of the signs posted above the phones warning of the monitoring and taping, and defendant's signed consent form and receipt of the prison manual shortly, the court concluded defendant impliedly consented to the taping.

Although the district court eschewed reliance on consent, we believe both the ordinary course of duties and consent exceptions are present here. While the evidence of

Mr. Gangi's consent is less transparent than that in *Van Poyck*, we nonetheless believe the record fully supports at least three inferences indicating that Mr. Gangi impliedly consented to the taping of his calls. First, Mr. Gangi is cognizant of detention settings, permitting a strong inference he fully understood the fact that jail telephones are monitored. Second, Mr. Gangi, a keen observer of detail, was housed in Pod B for three days before his transfer to the hospital. Third, even if he did not see the signs above the telephones on Pod B before his transfer, the fact that he maneuvered himself into an area of the Jail where he would be alone and could access a different telephone implies he believed this phone, unlike the clearly marked Pod B phones, was unmonitored. "[U]nder certain circumstances, prisoners are deemed to have given consent for purposes of Title III to the interception of their calls on institutional telephones." *United States v. Workman*, 80 F.3d 688, 693 (2d Cir. 1996). Mr. Gangi impliedly consented to the monitoring of his telephone calls. Having reached this conclusion, we need not address the law enforcement exception.

Further, despite the district court's initial statement "defendant did not raise any Fourth Amendment issues in the pleadings . . . although the defendant has raised them in the past," it later cited *Van Poyck* and *United States v. Sababu,* 891 F.2d 1308 (7th Cir. 1989), to observe that the reduced expectation of privacy in a prison setting necessarily defeats an inmate's claim of an objectively reasonable expectation his calls are private under the Fourth Amendment. Nonetheless, relying on *Van Poyck* Mr. Gangi persists in

arguing that absent notice, he had a constitutionally protected, reasonable expectation of privacy. Because the government has responded to this contention, we briefly address it.

Even if defendant reasonably believed his calls were private and protected by the Fourth Amendment, "no prisoner should reasonably expect privacy in his outbound telephone calls. Although prisoners do not forfeit all their privacy rights at the jailhouse steps, they do have those rights severely curtailed." *Van Poyck,* 77 F.3d at 291 (citations omitted). We agree with the Ninth Circuit that "any expectation of privacy in outbound calls from prison is not objectively reasonable and that the Fourth Amendment is therefore not triggered by the routine taping of such calls." *Id.; see also Workman*, 80 F.3d at 694; *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999) (prison regulations permit no expectation of privacy in mail). This conclusion conforms to our precedent that expectations of privacy are "diminished by the exigencies of prison security," *Romo v. Champion*, 46 F.3d 1013, 1018 (10th Cir. 1995),(*quoting Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir. 1985)); *see also Boren v. Deland,* 958 F.2d 987, 988 (10th Cir. 1992); and mirrors our analysis under Title III that defendant's implied consent to monitoring vitiates his expectation of privacy in his inmate calls. *See United States v. Turner*, 209 F.3d 1198, 1200 (10th Cir. 2000).

## II. Sentencing Issues

## A. Standard of Review

In assessing the district court's sentencing determination, we review its factual findings under a clearly erroneous standard and its application of the Sentencing Guidelines de novo. *United States v. Roberts*, 185 F.3d 1125, 1144 (10th Cir. 1999). For its departure decisions, the "[e]ssential nature of the question presented, whether legal or factual, guides [our] standard of review." *United States v. Collins*, 122 F.3d 1297, 1303 (10th Cir. 1997). In determining whether to depart from the applicable Sentencing Guidelines range, the district court must distinguish whether the case falls under the category of a "heartland case" or an "unusual case," and, if outside the former, that is, outside the set of typical cases embodying the conduct each Guideline describes, the court may decide to depart from the prescribed sentencing range. 18 U.S.C.A. § 3553(b); U.S.S.G. Ch. 1, Pt. A, intro., 4(b); § 5K2.0, Grounds for Departure (Policy Statement). We accord substantial deference if the court's decision rests on factual findings, but if it rests primarily on a legal conclusion, for instance whether a certain factor is a permissible ground for departure, our review is plenary. *Koon v. United States*, 518 U.S. 81, 98 (1996); 18 U.S.C.A. § 3553(b). Moreover, as surely present here, the district court's departure decision "will not involve a 'quintessentially legal' interpretation of the words of a guideline, but rather will amount to a judgment about

- 12 -

whether the given circumstances, as seen from the district court's unique vantage point, are usual or unusual, ordinary or not ordinary, and to what extent." ***United States v. Whiteskunk***, 162 F.3d 1244, 1249 (10th Cir. 1998), (*quoting **United States v. Rivera***, 994 F.2d 942, 951 (1st Cir. 1993)).

### 1. Calculation of loss to increase base offense level

Although U.S.S.G. § 2F1.1 sets the base offense level for the crime of fraud and deceit at six, the district court added eight levels to reflect a loss of "more than $200,000." U.S.S.G. § 2F1.1(b)(1)(I). This result, Mr. Gangi offers, essentially awarded the government "bonus points for attributing a loss of $210,000 to Defendant Gangi masquerading as an 'intended loss.'" He contends the court erred in interpreting the Guideline to permit an increase based solely on intended loss under circumstances which defy the possibility of his actually inflicting a loss.

In calculating the amount of loss under § 2F1.1, the court looked to Application Note 8 of the Commentary, valuation of loss, which referenced the Commentary to § 2B1.1 ("loss is the value of the money, property, or services unlawfully taken . . . if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."). On this basis, the court concluded Mr. Gangi intended to inflict a $210,000 loss, stating,

> I cannot escape the conclusion that the target and object of this matter was
> to obtain, convert to the use of Mr. Gangi for the purpose of securing
> release from the Uinta County jail the sum of $210,000.

- 13 -

Mr. Gangi I'm sure did not care whether or not it all shook out, the authorities felt sorry for the bank and would return the money to the bank and suffered no loss and the county would absorb that loss or people, fine and dandy, but that was not your intent and says nothing about the intent of Mr. Gangi. And there's no evidence here that would indicate his intent was anything other than attempting to obtain the money to secure his release from incarceration.

This conclusion fully aligns with our interpretation of calculating loss under U.S.S.G. § 2F1.1. "To meet the requirements of the Guideline, . . . the record must support by a preponderance of the evidence the conclusion that [the defendant] realistically intended a [particular] loss, or that a loss in that amount was probable." *United States v. Smith*, 951 F.2d 1164, 1168 (10th Cir. 1991). That loss, however, "cannot exceed the loss a defendant in fact could have occasioned if his or her fraud had been entirely successful, regardless of whatever loss the defendant subjectively believed he or she could impose on the fraud victim." *United States v. Haber*, 251 F.3d 881, 892 (10th Cir. 2001), *(quoting United States v. Galbraith*, 20 F.3d 1054, 1059 (10th Cir. 1994)). "[T]he purpose of the loss calculation under the Sentencing Guidelines is to measure the magnitude of the crime at the time it was committed." *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998).

Nonetheless, Mr. Gangi contends he *caused* no loss, the first check was recovered, the second, never drafted. He relies upon *Smith*, 951 F.2d at 1164, whose facts are distinguishable. A better fit is *United States v. Burridge*, 191 F.3d 1297, 1301 (10th Cir. 1999), in which defendant claimed his base offense level should only reflect

the actual loss his victims incurred, several having already recovered in civil actions they instituted. We disagreed, crediting the district court's factual findings and credibility determination Burridge could not have repaid the money. "[T]he district court was in a far better position than are we both to assess the credibility of [defendant's] contentions that he intended to make all of his victims whole and to assess the amount of loss he attempted to inflict." *Id.* at 1302.

Here, one check was cut and delivered to the Jail; the other, but for fortuities, would have followed the same route. The evidence supports Mr. Gangi was capable of, intended to cause, and had no ability to repay the $210,000 planned loss to the Bank. The district court did not err in finding these facts and interpreting the Guideline to include the entire intended loss.

## 2. More than minimal planning increase.

Mr. Gangi contends the district court's increasing his base offense level two levels for more than minimal planning under U.S.S.G. § 2F1.1(b)(2) was erroneous. He complains the court improperly supported the increase solely on the *assumption* Mr. Gangi did his "homework" to "discover the name of Dave Madia, learning his relationship to the community." Mr. Gangi wonders "what is so magical" about nine calls over four hours on a single afternoon, reminding there is nothing complicated about making phone calls. He likens his case to *United States v. Archuletta*, 231 F.3d 682 (10th Cir. 2000), in which the court reversed the increase for more than minimal

planning upon concluding the "scheme" to commit bank fraud simply involved

fraudulently opening a checking account in defendant's deceased sister's name.

Rejecting Mr. Gangi's objection to the increase, the district court stated,

The other aspect strikes me as interesting in this matter, and this kind of flows into a number of issues we're considering here, is that it is evident, from the criminal history . . ., that Mr. Gangi lives and breathes through impersonation and influencing people by misdirection through words and acts. And to him, these things can be done very quickly. He's had a lot of practice in pressure situations and with a great deal of spontaneity. To say that means there was no plan, does not require thought when planning, that just means he's damn good at it.

Section 2F1.1(b)(2)(A) provides a two-level increase "[i]f the offense involved

(A) more than minimal planning," which means "more planning than is typical for

commission of the offense in a simple form . . .[;] if significant affirmative steps were

taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or

Impeding the Administration of Justice) applies . . .[:] is deemed present in any case

involving repeated acts over a period of time, unless it is clear that each instance was

purely opportune." Application Notes, Comment (f), § 1B1.1. In *United States v.*

*Proffit*, 304 F.3d 1001, 1005 (10th Cir. 2002), we discussed these three groups of

activities meriting the enhancement. The first, acts to conceal the offense, must differ

from the conduct used to support enhancement under obstruction of justice. The second,

"the notion of repeated acts refers to a series of acts each of which would be criminal

standing alone, rather than referring to a crime that requires the completion of a series of

steps." *Id.* For the third, we looked to the amount of planning required to consummate

- 16 -

the scheme. In that case, then, we believed "the proper inquiry is whether Defendant's actions demonstrated a greater amount of planning than is required to defraud an individual of between $40,000 - $70,000 in a simple manner." *Id.* at 1006. Under this analysis, defendant's many acts to ingratiate himself to the victim — flying to Denver, telephoning him several times, and concocting false stories — fully supported the enhancement.[4]

Here, other than Lieutenant Evins' testimony Mr. Gangi received a telephone book on July 10, there is no evidence detailing the "greater amount of planning" involved in this offense. Nonetheless, as the district court found, the scheme was the product of Mr. Gangi's thirty-year career of fabricating tales to defraud restaurants, hotels, jewelry stores, and car dealerships. His canny selection of a wealthy local citizen who happened to serve on the bank's board; his bravura in directing bank tellers to access "his" account with his name alone intimidating them to bypass standard bank procedures requiring specific identification over the phone; his metamorphosis into the owner of the Padres to pressure the Spence law firm to challenge the California arrest warrant — if the record fails to detect precisely how Mr. Gangi contrived this scheme, it surely reflects "repeated acts," each of which constitutes a crime and a "complex"

---

[4] In *United States v. Hill,* 197 F.3d 436, 446 (10th Cir. 1999), we found defendant's single act developed over two days, involving one telephone call and one meeting, represented more than minimal planning. In *United States v. Rice*, 52 F.3d 843 (10th Cir. 1995), an annual scheme to receive tax refunds constituted more than minimal planning, despite defendant's characterization he only filed one tax form.

scheme. While the planning may have been subliminal and not "minimal" for Mr. Gangi, the end product fully supports the two-level increase.

### 3. Obstruction of Justice

Mr. Gangi contests the two-level increase the court imposed for obstruction of justices.[5] He contends the note in his hospital chart and a note in his Center record; are too remote in time and too different from their closest counterpart, escape, to constitute obstruction of justice. Observing that false statements in one context do not suffice in another, Mr. Gangi asks how "justice" is obstructed by a note found at the central booking station where his bond was posted, or a revision in his medical chart transferring him to a private hospital.

In support of the increase, the court stated:

Here what we have are what appears to the Court to be attempts that were made on one seeking the removal to a more escape-friendly hospital setting, and the other – the other directing that the defendant be released. The circumstances that were reported and materials submitted by the United States Attorney really leaves [sic] little doubt in my mind that these things haven't come from defendant, just by the surrounding circumstances. It would be strange, indeed, but they did not. And they're certainly consistent with everything that we've seen in an almost 30 year

---

[5] § 3C1.1 Obstructing or Impeding the Administration of Justice
    If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct . . . increase the offense level by 2 levels.

history with similar conduct on the part of the defendant in his dealings with state and federal authorities.

The Commentary to § 3C1.1 lists "escaping or attempting to escape from custody before trial or sentencing . . ." Commentary, Application Note 4(f). In ***United States v. Wiseman***, 172 F.3d 1196, 1218 (10th Cir. 1999) (bald assertion escape report is unreliable is insufficient to reverse district court), and ***United States v. Amos***, 984 F.2d 1067 (10th Cir. 1993) (no relationship necessary between the guidelines offense and the obstructive conduct), we affirmed the obstruction of justice enhancements for attempted escapes while awaiting trial. *See also* ***United States v. Davis***, 8 F.3d 923 (2d Cir. 1993) (defendant's writing false reports sent to corrections officials supported § 3C1.1 enhancement). Once again, read against Mr. Gangi's criminal career, which includes several escapes from county jails, and failure to return to serve a weekend sentence to a halfway house, or to the United States Probation Office in May 1999, the nexus between the notes and his effort to wilfully obstruct justice is clear. The district court did not err in this conclusion.

### 4. Criminal History Increase

Over counsel's objection of double counting, the court departed upwards to reflect Mr. Gangi's "exceptional" criminal history. Mr. Gangi does not challenge the upward departure itself, only its "unjust" degree. Mr. Gangi contends the PSR exaggerated the "<u>nature</u> of [his] history," double counted offenses, and adopted a formula to determine the offense level of 26 which neither *Akers* nor *Lowe* propounds.

Because Mr. Gangi does not contest the court's decision to depart under U.S.S.G. § 4A1.3, which is amply supported by the record, we examine only the eight offense levels the court added to the base offense level of 18 to reflect the additional 24 criminal history points the court adopted from the PSR. [6] The district court explained the basis for its upward departure, stating,

> I find and conclude two things. If this defendant is released, there is an exceedingly high likelihood, based upon his criminal history, that there would be new crimes committed very, very shortly. He is highly recidivist.
>
> Secondly, although I do not consider [Gangi] to be a person who focuses his activities on physical violence, there are robbery convictions in his past, there are assaults, there are incidents in various settings of throwing his feces and urine at other people, at individuals, so he's capable of doing those things, but more particularly, I think the public would be particularly victimized and suffer loss.
>
> He is forceful and aggressive in his ability to achieve what he desires and very clever in that regard.

Noteworthy in Mr. Gangi's criminal history, as reflected in the court's statement, is his relentlessness. Taught to steal by an alcoholic step-father, Mr. Gangi ran away from home at age 15 and has filled the subsequent thirty years, until his sentence here, with

---

[6] The PSR computed 23 criminal history points and added two points under U.S.S.G. § 4A1.1(e) based on Mr. Gangi's committing the offense less than two years after release from his prior imprisonment. These 25 points are 12 more than necessary to qualify for Criminal History Category VI. To this number, the court added another 12 points to reflect the PSR's judgment about additional sentences with minimum terms exceeding one year and one month in the computation. On that basis, the criminal history score totaled 37 points, 24 above the 13 required for Criminal History Category VI.

every manner of theft and false pretenses, allowing no lapse of time between offenses. As the district court found, Mr. Gangi's modus operandi is predation, and his past assures he is incapable of relating in any other manner to a community.

The district court then set forth its methodology in adding eight offense levels, adopting the formula in the PSR:

> In this case, the Court determines the defendant has another 24 countable criminal history points, assuming a conservative increase of 12 percent. In other words, three criminal history points per level, 24 additional criminal history points would qualify for eight criminal history categories, if such existed. Although they do not, it appears reasonable to base a departure on the 12 percent increase for each criminal history category. 12 percent times eight categories is 96 percent increase, and that results to take the offense level to level 26 by category – Criminal History Category VI, carries a guideline range of 120 to 150 months in this matter.

The court purported to rely on *Akers*; *Bartsma*, and *Lowe*.

"We often have stated the district court is not required to justify the degree of departure with mathematical precision, but the court is required to include in its justification 'some method of analogy, extrapolation or reference to the sentencing guidelines.'" *Bartsma*, 198 F.3d at 1197, (*quoting* **United States v. O'Dell**, 965 F.2d 937, 939 (10th Cir. 1992)). In this case, the district court explained the basis for the degree of departure, *Lowe*, 106 F.3d at 1503, and although our precedent does not require precise formulas, attributed each increase in offense level to equal three additional points in criminal history.

In *Lowe*, the court added two offense levels to "correspond[] to the two extrapolated criminal history categories [above Criminal History Category VI]." *Id.* at 1503. In *Akers*, to defendant's offense level of 17 and criminal history category of VI, the court added 15 criminal history points, indicating that three had "'narrowly missed' being counted," and increased the offense level by five to 22. 215 F.3d at 1104.

Here, the court concluded the additional 24 criminal history points merited an eight level increase in the offense level based on this precedent and the formula it adopted from the PSR. Although there is precedent for equating a number of additional criminal history points to offense levels, we are concerned that the "sentence imposed stretches the proportionality concept to the limit." *United States v. Bernhardt*, 905 F.2d 343, 346 (10th Cir. 1990). However, because the court sentenced at the bottom of the guideline range, also within offense level 26, Criminal History Category VI, we cannot say the degree or method of departure is an abuse of discretion. The record fully supports its reasonableness. As the district court observed, Mr. Gangi is "unique in what [he] present[s] to the Court."

We, therefore, **AFFIRM** the district court's denial of the motion to suppress. We **AFFIRM** the increases to the sentence in their entirety.

ENTERED FOR THE COURT

John C. Porfilio
Senior Circuit Judge

- 22 -