FILED
United States Court of Appeals
Tenth Circuit

February 17, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRUCE BECKNER, a/k/a Bill Evans,

    Defendant - Appellant.

No. 24-2109

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:15-CR-02218-JB-1)**
_____

Marshall J. Ray, Law Offices of Marshall J. Ray, LLC, Albuquerque, New Mexico, for Appellant.

Sean J. Sullivan, Assistant United States Attorney (Ryan Ellison, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Appellee.
_____

Before **HARTZ**, **MCHUGH**, and **EID**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Bruce Beckner conducted a fraudulent scheme to obtain loans and investments ostensibly to finance a truck stop in Deming, New Mexico. A jury convicted him of bank fraud, wire fraud, and conspiracy to commit bank, mail, and wire fraud. On appeal from his convictions and sentence, Defendant challenges

several of the district court's evidentiary rulings, its imposition of two enhancements to his sentence, and the substantive reasonableness of his sentence when compared to that of a coconspirator.

We reject the challenges to the admission of evidence that showed Defendant's control of and financial interest in the scheme. The court properly admitted evidence that Defendant directed a confederate to engage in a phony marriage to Defendant's foreign girlfriend (to enable her to live in this country), which served as evidence of his control over the confederate and the scheme as a whole. The court also properly admitted evidence of Defendant's ties and travel to Central American countries as evidence of his hidden financial interest in the truck stop and his consciousness of guilt. And the court did not err in admitting evidence that loan proceeds were distributed to an offshore company beneficially owned by Defendant's girlfriend.

We also affirm the district court's application of the enhancements to Defendant's sentence and the sentence's substantive reasonableness. Defendant's guideline offense level correctly reflected that he was a "leader" of "extensive" criminal activity, USSG § 3B1.1(a), and that he "intentionally engaged in or caused" criminal conduct involving "sophisticated means," USSG § 2B1.1(b)(10). Also, although Defendant received a much greater sentence than his codefendant, this disparity was warranted because Defendant was more culpable in the scheme, and his sentence was aggravated by factors not shared by the codefendant.

After describing the fraudulent scheme, we address Defendant's challenges to the admissibility of evidence and then turn to the sentencing issues.

## I.   BACKGROUND

Defendant does not challenge the sufficiency of the evidence of his guilt. We view that evidence in the light most favorable to the rulings by the district court. *See United States v. Jarvison*, 409 F.3d 1221, 1224 (10th Cir. 2005). The following summary is supported by the record, but various gaps and inconsistencies in the evidence prevent a fully coherent description.

The truck stop that was the focal point of Defendant's scheme was outside of Deming, New Mexico, on Interstate 10. He apparently first became involved with the truck stop around 2006. At that time the truck stop was a small operation at a dilapidated facility with about 14 employees. But by the time the operation was forced into receivership in 2011, the facilities had been expanded and improved, and the number of employees was about 120. The expansion had been financed by several loans from financial institutions and investors, some of whom purchased equity interests. Most of the loans and investments, however, had been procured by fraud. Money obtained from lenders and investors was not used or secured as promised. And Defendant was not who he said he was; he used an alias to conceal his past, particularly his huge debts. On paper he may not have appeared to be the central figure in the fraud, but he concealed his control of the truck stop through the use of multiple corporations, foreign and domestic, awarding executive titles to those under his sway.

3

To assist the reader in navigating the evidence, particularly the flow of money and the manner in which Defendant controlled the truck stop and profited from it, we introduce four central individuals and the corporate entities used in the fraud.

First, Defendant. Before the events described at trial he had been living in Honduras with his wife Sandra Franklin, with whom he had fathered three children. The trial record does not indicate how his involvement with the truck stop began, but in 2006 Defendant moved to Deming to take it over. By then he was saddled with enormous debt[1] and would not have been attractive to banks and other lenders or investors. To avoid financial scrutiny, he assumed the alias "Bill Evans," a name he shared with a lake about 60 miles from Deming.

Sean Curtis accompanied Defendant when he moved to Deming. He was 19 years old at the time. Curtis had been a close friend of Casey Beckner, the son of Defendant and Franklin, who died in a motorcycle accident in Honduras in 2002. After that, Curtis worked in "television production" in Los Angeles, R., Vol. 2 at 213, but he remained close to Defendant's family, and eventually (after the end of the fraudulent scheme) married a daughter of his. Curtis's initial position at the truck stop was "operating manager."

---

[1] The jury was informed only that Defendant owed "a large amount of money to a lot of people" from "a prior failed business venture." R., Vol. 2 at 542. In a district-court ruling not challenged by the government, the government was not permitted to point out that in 1998 Defendant had been convicted of securities fraud, mail fraud, and conspiracy to commit mail fraud; sentenced to 33 months of imprisonment; and ordered to pay $15,601,742 in restitution.

Arthur Herlihy was recruited by Defendant and Curtis about a year after they arrived in Deming. He first served as a consultant, helping with plans to renovate and expand the truck stop and obtain financing. He purportedly had an advanced degree in finance or business from the University of California at Berkeley. He typically worked remotely from his home in Santa Fe, where he also taught at a community college. Within a year or so of arriving in Deming, Herlihy assumed Curtis's title as operating manager of the truck stop.

Rita Xiomara Romero Jimenez (Romero) served as a conduit of money from the truck stop. A Honduras native and citizen, she was Defendant's girlfriend, and he had fathered three of her children. When Defendant and Romero began their relationship in Honduras, Defendant was still married to Franklin.

These individuals participated in the truck stop through a number of domestic and foreign corporations:

Petro Fuels Limited SA was a Panamanian company registered in 2006. Unbeknownst to Curtis, Romero was the beneficial owner of the company.

Seashell Fuel Corporation SA, also based in Panama, was established in 2007. Curtis was the general manger of Seashell and held power of attorney, but he did not know how Seashell was organized. From 2007 to 2011 the truck stop made regular payments to Seashell totaling more than $240,000, which, per the prosecution's forensic accountant, ended up with Defendant and Romero. Defendant told truck-stop employees that if payments to Seashell were missed, someone might shoot Defendant

5

or cut off his head.  The trial record does not indicate that Seashell or Petro Fuels owned any assets aside from their interests in the truck stop.

Fuel 4 Less, LLC, was organized in New Mexico by Franklin in September 2005. Fuel 4 Less was the operating entity for the truck stop. The trial record is unclear and inconsistent regarding the company's formation and ownership, suggesting the unimportance to the principals of the formalities regarding who owned what. Consider documents submitted by Fuel 4 Less in support of a loan in 2009. An operating agreement dated December 31, 2008, recited that Fuel 4 Less was formed in September 2005, with Curtis and Seashell as its sole members. But, as stated above, Seashell was not established for another two years, in October 2007. This is reflected in two documents attached to the operating agreement that purport to be minutes of Seashell board meetings, and by an October 2007 form submitted by Curtis to retain a Panamanian law firm to create Seashell. It is also hard to reconcile (1) the assertion that Curtis and Seashell were the only initial members of Fuel 4 Less in 2005 with (2) a May 2007 agreement between Curtis and Petro Fuels stating that Curtis had 49% of the ownership rights in Fuel 4 Less and would pay Petro Fuels $5,100,000 to acquire the other 51% (for himself or a nominee entity), together with some equipment. A July 2008 document then states that Curtis and Herlihy had interests of about 13% each in Fuel 4 Less.

Whatever the ownership interests, Franklin originally appointed Curtis as Fuel 4 Less's operating manager, though that role would later be transferred to Herlihy. And in August 2009 Fuel 4 Less entered into a management agreement with

6

Defendant to compensate him (or, at his election, an entity owned by him) as the full-time manager of "all aspects of operations and current construction of improvements to the [truck stop]." R., Vol. 1 at 730. Under the agreement Defendant would start with a monthly salary of $6,000 and obtain a 5% equity interest in the truck stop after one year, an additional 5% after two years, and a further 7.5% after three years.

Savoy Travel Center, LLC, organized by Curtis in November 2007, took over operating the truck stop and its restaurant and tire shop from Fuel 4 Less when Herlihy joined the truck stop as a salaried employee in 2008. Herlihy became Savoy Travel Center's operating manager. Fuel 4 Less owned Savoy Travel Center.

Truckers Paradise, LLC, organized by Herlihy in February 2008, was formed to operate a bar at the truck stop. Herlihy was the operating manager and sole stockholder.

Savoy Terminal, LLC was organized by Curtis in 2009. A fuel terminal is "a set of storage tanks that holds fuel for wholesale distribution." R., Vol. 2 at 622. The purported function of Savoy Terminal was to purchase fuel at wholesale prices from refineries and other fuel terminals before reselling the fuel to the truck stop at a profit. But the truck stop never operated a fuel terminal, and the truck stop never made any fuel purchases from Savoy Terminal.[2]

---

[2] The truck-stop umbrella included other entities, including Savoy Development Company, LLC; Savoy Holdings, LLC; The Savoy Group, LLC; Savoy Sand & Gravel, LLC; and Capital Resources Management Limited SA, none of which made a significant appearance at trial.

It appears from the trial record that Defendant had no formal ownership interest in any of these companies when they sought financing from lenders and investors. The only relevant company on which Defendant left any fingerprints was Top Management, LLC, the entity through which he was paid for managing the truck stop. Defendant organized Top Management under his "Bill Evans" alias in 2008, naming Curtis as its operating manager.

We now turn to the truck stop's financing transactions. Virtual Realty Enterprises (VRE), an investment company in Missouri, made two loans in October 2007. One loan was made to Fuel 4 Less (with Curtis signing as a managing member) in the amount of $3,740,000, to be used for construction of a new building and paving, with advances being made as work actually performed was billed or invoiced. The other loan was to Curtis individually in the amount of $5,100,000. The loan agreement between VRE and Curtis stated that it was for "development of the land" at the truck stop. Gov't Trial Ex. 19.1 at 5. But Curtis testified that the purpose of this loan was to acquire the outstanding ownership of the company, and the amount of the loan matched the price of Curtis's previously mentioned purported purchase of Petro Fuels's 51% ownership interest in Fuel 4 Less. The proceeds of the $5.1 million loan were wired to Petro Fuels, owned by Romero. Just over $2 million was then sent to a Petro Fuels bank account of which Romero was the beneficial owner. The remaining $3 million was wired to Fuel 4 Less. Both VRE loans had a two-year term. These loans and the payment to Romero were not part of the charged conduct, and the prosecution did not contend that they were obtained through fraud.

8

The truck stop's remaining financing was obtained through the fraud charged in the indictment. First, in December 2008 the truck stop purchased a liquor license for the bar to be operated by Truckers Paradise. Of the license's $300,000 price, Truckers Paradise contributed $180,000. The remaining $120,000 was loaned by Maurice Bonal, who brokered the sale, and his wife. Herlihy signed the loan for Truckers Paradise, and Herlihy and Defendant signed personal guarantees for the loan. The loan was also secured by the liquor license. Defendant used his "Bill Evans" alias throughout the transaction, including on his personal guarantee.

Ostensibly to pay off the loan to the Bonals,[3] Fuel 4 Less and Savoy Travel Center obtained a $135,165 loan from First New Mexico Bank in July 2009. The borrowers were Fuel 4 Less, Savoy Travel Center, Curtis, Herlihy, and Defendant. Truckers Paradise pledged the liquor license as collateral for the loan—even though it had already been pledged to secure the loan from Bonal—in a security agreement that stated that the license was free and clear and unencumbered. The security agreement was signed by Herlihy for Truckers Paradise and Savoy Travel Center, by Curtis for Fuel 4 Less, and by Curtis, Herlihy, and "Bill Evans" as individuals. Defendant also submitted a personal financial statement showing that "Bill Evans" had no liabilities, with net and total assets of $76,612. The truck stop used the loan

---

[3] The truck stop defaulted on the Bonal loan on July 1, 2009. It renegotiated the terms of the loan with Bonal in December 2009. Herlihy again signed the renegotiated loan, this time representing Savoy Travel Center.

9

proceeds primarily for operational expenses. None of the proceeds were used for the purported purpose of paying off the debt to the Bonals.

The largest loan was arranged in October 2009 by the New Mexico Finance Authority (NMFA) to refinance the VRE loan, whose two-year term was about to expire. NMFA is not a state agency, but it was established by state statute to finance public infrastructure and economic development in New Mexico; Finance New Mexico is a subsidiary. The truck stop received a $4 million loan from Finance New Mexico, the funds having been invested by US Bank Community Development Corporation; and VRE loaned another $12 million for a total principal of $16 million.

In the application materials for this loan, Defendant was represented as having been a "liaison to the Minister of Finance, Montenegro, Yugoslavia." R., Vol. 2 at 474. Herlihy signed a security agreement for the NMFA loan on behalf of Fuel 4 Less, Truckers Paradise, and Savoy Travel Center, pledging the buildings, equipment, inventory, and accounts receivable of the truck-stop entities as collateral. Curtis signed the agreement for Savoy Development Company. The loan was also secured by mortgages on the land. Defendant signed a personal guarantee in the name of "Bill Evans" and another document acknowledging that his management agreement with Fuel 4 Less had been assigned to the lenders. He also agreed to indemnify the lenders from liability for any environmental damage caused by leaks at the truck stop.

The truck stop received periodic disbursements of the NMFA loan upon completion of certain specific projects and expenses. Per the terms of the loan, the

10

truck stop set aside a portion of the loan proceeds to use for interest payments. Initially, Fuel 4 Less made those payments, but only out of that reserve. Once the reserve was exhausted, the truck stop stopped making payments; it did not pay back any portion of the loan principal or interest out of the truck stop's revenue.

An additional $2.5 million of the truck stop's financing came from individual investors, primarily in response to ads in the *Los Angeles Times* promising a 24% return. Defendant signed a form letter to potential investors (under the name "Bill Evans," with a letterhead of "The Savoy Group, LLC" above "Savoy Travel Center, LLC" and "Savoy Terminal, LLC," R., Vol. 1 at 237) and provided the script for truck-stop employees to follow when potential investors inquired. The letter said that "Savoy Terminal will utilize private lender funds to purchase fuels that are then sold to the truck stop at a profit." R., Vol. 1 at 237. And the script said that "Savoy Travel Center" is "a full service truck stop" with its "own fuel terminal" and that the investor's "money would be used to purchase diesel fuel through our fuel terminal then resold to our truck stop at a profit." Gov't Trial Ex. 56 at 1.

But, again, there was no operational fuel terminal at the site, and the fuel the truck stop was selling was bought from suppliers, not from the purported truck-stop terminal. When the first investments came in, Savoy Terminal did not even have a bank account. The funds were deposited in the truck stop's operating account and used to pay for operations. Some of the investors loaned money to Savoy Terminal and/or Savoy Travel Center and received promissory notes purportedly secured by company assets. Others acquired shares in Fuel 4 Less.

11

Proof of the fraud at trial was fairly straightforward. The prosecution's more challenging task was to demonstrate that Defendant was the ringleader behind the fraud. After all, on paper the principals for the truck-stop entities were Curtis and Herlihy. Defendant did not have a direct ownership interest in any of the domestic truck-stop entities at the time of the fraudulent transactions, and he signed loan documents only in his individual capacity—never on behalf of the truck stop. His duties were to manage the operations of the truck stop, not to handle the financial end. And his earnings as manager did not indicate that he was in total control. His approximately $481,000 in compensation from 2008 to 2011 did not greatly exceed Herlihy's salary of $415,000 or Curtis's of $456,000 for similar periods.

But there was still ample evidence to support the government's theory that Defendant pulled the strings at the truck stop. To begin with, the testimony showed that neither Herlihy nor Curtis was in command. Herlihy was generally several hundred miles away in Santa Fe. Defendant described Herlihy to truck-stop employee Toni Wright[4] as a "figurehead." And when it came time to raise money through promissory notes, truck-stop employees would sign the notes with a stamp of Herlihy's signature at Defendant's direction.

---

[4] Curtis testified that Wright worked in administration and eventually became the truck stop's "[g]eneral manager," R., Vol. 2 at 321, but she was not involved in the truck stop's financing transactions. Wright described herself as the truck stop's "director of operations." *Id.* at 343. She managed the truck stop's payroll and banking, dealt with suppliers and vendors, and was responsible for human resources, for which she was paid roughly $3,000 per month. Defendant was her direct supervisor.

As for Curtis, he was 19 when he moved to Deming to help Defendant with the truck stop. Both he and Wright, who eventually succeeded him in handling the truck stop's books, lacked experience or qualifications in accounting, leaving the truck stop's financial records in disarray. And though Curtis was the operating manager of Top Management (through which Defendant drew his salary), Curtis did not exercise control over the money going in and out. His standard practice was to sign blank checks for the company and give them to Defendant.

The government offered one particularly compelling illustration of Defendant's control over Curtis: that he married Defendant's girlfriend Romero at Defendant's request. While working full time at the truck stop, Defendant wanted Romero, a resident of Honduras, to join him in Deming. If she were married to an American citizen, she could obtain a visa to the United States. At that time, however, Defendant was still married to Franklin and so could not wed Romero to sponsor her visa himself. To oblige Defendant, Curtis married Romero in Las Vegas, Nevada, in 2008.

Defendant exercised similar control over other aspects of the truck stop. For example, he signed form letters to investors and provided the script for truck-stop employees to follow when speaking with potential investors. The letters and the script falsely told investors that their money would be used to purchase fuel for the truck stop's fuel terminal that would be resold to the truck stop at a profit.

Defendant also structured the truck stop to make it harder to determine his degree of influence. He used foreign bank accounts and foreign corporations like

13

Seashell and Petro Fuels to take money from the truck stop and harbor it abroad. Once Defendant's interests in these foreign companies and bank accounts are taken into consideration, his stake in the truck stop (reflecting his degree of control) is better understood. Although Defendant's salary through Top Management did not greatly exceed Curtis's or Herlihy's salaries, he received another $243,000 from payments to Seashell. More importantly, his girlfriend and mother of three of his children obtained an additional $2.1 million from the loan for the buyout of Petro Fuels.

Defendant was tried and convicted of bank fraud, wire fraud, and conspiracy to commit mail, bank, and wire fraud. The district court sentenced him to 210 months' imprisonment, at the bottom of his advisory guideline range of 210–262 months.

## II.    DISCUSSION

### A.    Evidentiary Rulings

Defendant's only challenges to his conviction arise from the admission of evidence. We review evidentiary rulings by the district court for abuse of discretion. *See United States v. Piette*, 45 F.4th 1142, 1154 (10th Cir. 2022). The government contends that some of Defendant's arguments on appeal were not preserved below so the rulings should be reviewed only for plain error. But because we hold that the rulings were not abuses of discretion, we need not address preservation.

#### 1.    *Marriage of Curtis to Romero*

Defendant complains of the admission of evidence that Curtis married Romero at the request of Defendant, who wanted her to join him in Deming.

14

Defendant argues that the jury would have reacted emotionally to the evidence that Defendant connived to circumvent immigration restrictions by arranging a sham marriage between his extramarital girlfriend and the young friend of his deceased son. He contends that the evidence was inadmissible under Fed. R. Evid. 403[5] because the risk of improper prejudice was substantially greater than any probative value.

As discussed above, however, the government sought to show that Defendant—rather than Curtis and Herlihy, the ones nominally in charge—was responsible for the fraud committed by the truck-stop operation. To that end, the prosecution introduced evidence that Defendant used Curtis and Herlihy to conceal Defendant's full responsibility for the fraudulent scheme. We find it hard to imagine that there could be stronger evidence of Defendant's control of Curtis than the evidence that Curtis married Defendant's girlfriend at his request. And given the strength of that evidence of control and the centrality to the trial of whether Defendant controlled Curtis, we cannot say that the district court abused its discretion in determining under Rule 403 that the probative value of the evidence was not substantially outweighed by the potential for unfair prejudice. The court could reasonably believe that any unfair prejudice would be limited—the jury would consider Defendant's involvement in "lying for love" much less damning than his use

---

[5] Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

of an alias and his participation in lying to investors. *Cf. United States v. Shippley*, 690 F.3d 1192, 1198–99 (10th Cir. 2012) (Gorsuch, J.) (holding that the prejudicial effect of evidence that the defendant had sold a witness drugs many times was reduced where the jury "had already heard testimony that [the defendant] was involved in other drug-trafficking activities"). And the district court limited the prejudicial effect by excluding from evidence a phony love letter that Curtis wrote Romero, which was the most salacious part of the marriage-fraud evidence.

Defendant further argues that the marriage evidence was inadmissible under Rule 404(b)[6] as evidence of uncharged criminal conduct, which established nothing more than his propensity to commit crime. We agree with Defendant that Curtis's phony marriage to Romero was a criminal violation of immigration law. *See* 8 U.S.C. § 1325(c) ("Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both"). The evidence was therefore subject to the restrictions of Rule 404(b), which governs the admissibility of evidence of prior bad acts. But the trial court could properly find that the requirements of Rule 404(b) were satisfied. Under the rule:

> (1) evidence of other crimes, wrongs, or acts must be introduced for a
> proper purpose; (2) the evidence must be relevant; (3) the court must

---

[6] Rule 404(b) states: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

make a Rule 403 determination whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) the court, upon request, must instruct the jury that the evidence of similar acts is to be considered only for the limited purpose for which it was admitted.

*United States v. McGlothin*, 705 F.3d 1254, 1262 (10th Cir. 2013).

Our above discussion of Defendant's Rule 403 objection establishes that the first three requirements were satisfied. And as for the fourth requirement, the district court gave a limiting instruction directing the jury that it could only consider "evidence of other acts engaged in by [Defendant]" as that evidence bore on Defendant's "opportunity, intent, and plan, and for no other purpose." R., Vol. 1 at 496. This instruction directed the jury not to make the propensity inference that Defendant complains of.

### 2.    *Defendant's ties to Central American countries*

Defendant next challenges the admission of evidence of his ties to Central America. The government offered a variety of such evidence. Defendant lived in Honduras before becoming involved in the truck stop and regularly traveled to Honduras from Deming to visit family, including his three children by Romero. Also, he directed proceeds from the truck-stop scheme to bank accounts in Central America. And he had become a citizen of Belize.

In particular, the government focused on Defendant's moving to Honduras after the truck stop entered receivership on September 7, 2011. On that day, agents from the New Mexico Securities Division and the United States Secret Service interviewed "Bill Evans" at Savoy Travel Center. The agents did not state that they

were members of law enforcement rather than bank regulators. One agent asked Defendant to provide photo identification. Defendant told the agent that he would retrieve his identification from his vehicle, but once he got to the vehicle he drove away at high speed. The next day, the agent identified himself to Defendant as law enforcement and handed Defendant an order to cease and desist from the sale of securities in New Mexico. Defendant flew to Belize on November 22. He did not return to the United States until he was arrested in Honduras and removed to this country more than seven years later.

The admissibility of this evidence was resolved before trial. The government moved to admit evidence of Defendant's sending proceeds of his fraud to Central America and of his Belize citizenship as proof of his intent to profit from the fraudulent scheme and evade legal consequences in the United States. The government further argued that Defendant in fact carried out that plan by fleeing the United States for Honduras and remaining there.

Defendant opposed the government's motion and filed his own motion to exclude evidence of his travel to and extradition from Honduras. He argued that evidence of his Central American ties was not relevant to or context for the offenses of conviction and should have been excluded under Rule 403. He further argued that the purported-flight evidence should have been excluded because his departure could be explained by his family ties to Honduras and the absence of any reason to remain in New Mexico after the collapse of the truck stop. And he pointed out that when he departed this country he had no notice that he was the subject of criminal charges. He

18

summed up that the "flight" evidence was too attenuated to support an inference of consciousness of guilt.

The district court ruled that it would allow the government to use the evidence of Defendant's sending money to the foreign bank accounts to support its theory that Defendant was safeguarding his criminal proceeds beyond the reach of his American creditors. It also admitted the evidence of Defendant's flight, as well as his earlier pattern of travel between the United States and Honduras, as probative of Defendant's consciousness of guilt. But the court agreed with Defendant that identifying the particular Central American countries could be prejudicial because jurors might associate them with corruption and financial crime. It therefore instructed the parties to refer to Honduras, Guatemala, and Belize as Country A, Country B, and Country C. The court also permitted Defendant to counter the government's characterization of his flight by presenting evidence of other explanations for his departure to Honduras, such as his family ties.

We see no reversible error by the district court. Evidence of Defendant's use of offshore accounts and companies allowed the jury to infer that he was sheltering from American creditors the assets he derived from the fraudulent transactions. Likewise, his relocation to Honduras after receiving the cease-and-desist order concluded his regular travel to and from the United States, giving rise to a reasonable inference of flight. Both inferences are probative of Defendant's consciousness of guilt.

At the same time, the risk of unfair prejudice was minimal. Referring to the countries involved by letter was one precaution. Also, Defendant was permitted to present to the jury evidence of his innocent reasons for going and remaining abroad and sending money there. And he was allowed to rebut the government's characterization of his flight by pointing out the two-month gap between his receipt of the cease-and-desist letter and his relocation to Honduras.

The district court did not abuse its discretion by letting the jury decide what Defendant's motives were. *See United States v. Akers*, 215 F.3d 1089, 1103 (10th Cir. 2000) ("This court has . . . rejected the notion that, in order for evidence of flight to be admissible in a criminal prosecution, there can be only one possible explanation for the defendant's flight: guilt of the crime or crimes charged").

### 3.    *Transfer of loan proceeds to Romero*

Defendant's final evidentiary challenge concerns the admission of evidence that Romero had received a large sum of money out of the $5.1 million loan to Curtis in 2007. Attorneys for VRE disbursed the loan proceeds directly to Petro Fuels (Romero's company). After sending $3 million of the loan proceeds back to Fuel 4 Less, Romero directed the remaining $2.1 million to another of Petro Fuels's offshore accounts, of which she was also the beneficial owner. Defendant did not tell Curtis that Romero owned Petro Fuels, so Defendant was the only truck-stop employee who knew about his interest in the buyout.

On appeal Defendant argues that the government characterized the buyout as deceptively taking money off the top. He argues that evidence of the buyout was

inadmissible under Rule 404(b) because it was offered to show his defective character—a propensity to commit crime—and should have otherwise been excluded under Rule 403.

We are not persuaded. The buyout evidence was admitted for the proper not-for-character purpose of showing Defendant's control over the scheme, and it was relevant and probative for that purpose. The approximately $480,000 that the truck stop paid Top Management—the entity created to pay Defendant for his services at the truck stop—from March 2008 to September 2011 did not greatly exceed Herlihy's salary of $415,000 or Curtis's of $456,000 for similar periods. But Defendant's girlfriend, the mother of three of his children, pocketed an additional $2.1 million, demonstrating Defendant's outsized stake in the scheme compared to Herlihy or Curtis.

And the potential for improper prejudice to Defendant is minimal. The government told the jury in its opening statement that directing the proceeds from the buyout to an account under the control of Romero and Defendant was "not part of the charged conduct in this case" and that the government was "not saying it's illegal for [Defendant] and Rita Romero to have that account or to move money into the account as a result of the sale of a business that they owned." R., Vol. 1 at 540–41. In addition, Defendant does not argue that he was denied a request for a limiting instruction on the matter. The district court could properly decide that the uncontested evidence of Defendant's false inducements to investors and concealment of his identity and debts from lenders and investors swamped any potential unfair

21

prejudice from jurors being concerned by the lawful transfer of $2.1 million to Romero.

### B.      Sentencing Enhancements and Sentencing Disparity

Defendant raises three challenges to his 210-month sentence. We review a district court's legal conclusions under the Sentencing Guidelines de novo and its factual findings for clear error, "giving great deference to the district court's application of the Guidelines to the facts." *United States v. Cifuentes-Lopez*, 40 F.4th 1215, 1218 (10th Cir. 2022) (internal quotation marks omitted). We review the substantive reasonableness of a sentence for abuse of discretion. *See United States v. Maldonado-Passage*, 56 F.4th 830, 842 (10th Cir. 2022).

### 1.      *Leader of an extensive scheme*

Defendant disputes the four-level enhancement to his guideline offense level under USSG § 3B1.1(a). The sentencing court can impose that enhancement if the defendant was a "[1] leader of a criminal activity that [2] involved five or more participants or was otherwise extensive." USSG § 3B1.1(a).

We first consider leadership. Whether a defendant is a leader in a criminal scheme depends on, among other things, the defendant's:

> exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader . . . .

USSG § 3B1.1 cmt. n.4.

Defendant argues that the enhancement was improper because his role in the scheme was minor compared to that of Herlihy, who did not receive the enhancement when sentenced on his guilty plea. Defendant asserts that it was Herlihy who put together the NMFA transaction and set up the private-investor program. He concludes that the evidence, when "fairly construed," shows Herlihy to have been at least as culpable as Defendant. Aplt. Br. at 34.

We are not persuaded. To begin with, our task is not to determine whether the evidence could have supported a finding favorable to Defendant. The question before us, rather, is whether the *district court's* view of the evidence was clearly erroneous. *See Cifuentes-Lopez*, 40 F.4th at 1218. We think not.

The district court could properly find that Defendant was a leader in the scheme. The evidence supports a finding that he exercised ultimate decision-making authority. For example, Defendant controlled the flow of money that was ostensibly managed by Curtis and Herlihy by having Curtis sign Top Management blank checks to be filled out by Defendant and by directing the use of the stamp of Herlihy's signature on checks and promissory notes. In addition, Defendant recruited accomplices, including Herlihy, and controlled others contributing to the scheme, such as by directing the efforts of truck-stop employees to solicit individual investors. And Defendant's outsized share in the truck stop's proceeds, via the $2.1 million buyout payment to Romero, further indicated that he was a leader in the scheme.

Defendant's efforts to compare his leadership to Herlihy's are unconvincing. Even if Herlihy was a leader in some respects, that would not prevent the district court from finding that Defendant was also a leader. As stated in USSG § 3B1.1 Application Note 4, "There can, of course, be more than one person who qualifies as a leader . . . ." And even if one view of the record could paint Herlihy as a leader, the district court's contrary reading is not clearly erroneous. At the sentencing hearing the district court stated that Herlihy was not a leader "on anything close to the level that [Defendant] has been." R., Vol. 2 at 1099. In support of that finding is the evidence that Defendant was the only participant in the scheme who could see the whole picture of the criminal activity. He was the only one with knowledge of where large sums of money were going, such as the buyout payment to Romero and the money that Defendant and Romero received from Seashell. In contrast, Herlihy, who Defendant described to Wright as a "figurehead," could hardly have been fully informed about the operations of the truck stop because he typically worked from his home in Santa Fe, and he did not even have control over the use of his own signature since a stamp of that signature was used by truck-stop employees at the direction of Defendant. The district court did not clearly err when it concluded that Herlihy "didn't know a whole lot" and "didn't know the scope of the scheme." *Id.* at 1100.

Nor are we persuaded by Defendant's efforts to paint Curtis as an independent force in the operation. He argues that "Curtis made his own decisions and held an ownership interest in the Travel Center business" and was not a "'dupe' under the thumb or control of [Defendant]." Aplt. Br. at 35. The district court could properly

24

have found such a claim risible in light of Curtis's age and inexperience, his marriage

to Defendant's girlfriend, and his providing signed blank checks to Defendant.

The second requirement for imposition of the sentencing enhancement is that

the criminal activity led by Defendant "involved five or more participants or was

otherwise extensive." USSG § 3B1.1(a). The district court relied on the "otherwise

extensive" alternative. It therefore did not need to find, nor did it find, that there were

five or more participants. Defendant's claim that the district court strained to find

*participants* in the scheme is a misreading of the court's opinion.[7]

What matters is that the court had ample evidentiary support in finding that the

fraudulent scheme was "extensive." We have said that a court assessing whether a

scheme is "otherwise extensive" under USSG § 3B1.1(a) must consider "the totality

of the circumstances, including not only the number of participants but also the

width, breadth, scope, complexity, and duration of the scheme." *United States v.*

*Yarnell*, 129 F.3d 1127, 1139 (10th Cir. 1997) (internal quotation marks omitted).

Whether a scheme is otherwise extensive depends on the involvement of "all

persons . . . during the course of the entire offense." USSG § 3B1.1 cmt. n.3. "Thus, a

---

[7] Defendant's error may have been caused in part by the district court's references to "unwitting participants." *United States v. Beckner*, No. CR 15-2218 JB, 2023 WL 4157269, at *38–40 (D.N.M. June 23, 2023). In this context the term is something of an oxymoron. USSG § 3B1.1 cmt. n.1 defines *participant* as "a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant." Thus, it is doubtful that one could be both "unwitting" and a "participant."

fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id*.

The district court concluded that though the scheme included only three knowing participants (Defendant, Curtis, and Herlihy), it relied on the services of a number of unwitting assistants, particularly the truck-stop employees who communicated with the investors. *See United States v. Beckner*, No. CR 15-2218 JB, 2023 WL 4157269, at *37–38 (D.N.M. June 23, 2023). Also, the scheme greatly harmed a number of victims, including over 20 individual investors, and generated a total loss of over $14 million. *See id*. at *39–40. And the scheme lasted more than two years (from at least 2009 when Defendant made false statements on the First New Mexico Bank Loan application until 2011 when the truck stop entered receivership).

Defendant contends that the scheme was mainly based in New Mexico, noting that the "loans, entities, bank accounts, and related public documents associated with the business were substantially located in and tied to New Mexico." Aplt. Reply Br. at 18. But an extensive scheme might well be limited to one state, and Defendant's characterization is a greatly truncated view of what was going on. The relevant corporate entities included the Panamanian companies, Seashell and Petro Fuels, which Defendant used to conceal his interests in the truck stop's entities and transactions. And the relevant bank accounts included those where Defendant concealed the proceeds of the scheme, such as the Panamanian accounts of Seashell and Petro Fuels. Defendant also ignores the individual investors, who came from

26

states including California and Pennsylvania, and who were solicited by advertisements for Fuel 4 Less in the *Los Angeles Times*. Indeed, Defendant acknowledges that "private investors mostly coming from California contributed about 15% of the overall capital into the business." *Id.*

We see no error in the application of USSG § 3B1.1(a).

### 2.    *Sophisticated means*

Defendant next challenges the two-level enhancement of his guideline offense level under USSG § 2B1.1(b)(10), which applied because his offense "involved sophisticated means" and he "intentionally engaged in or caused the conduct constituting sophisticated means." The district court—noting that "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means," USSG § 2B1.1(b)(10) cmt. n.9(B)—pointed out that Defendant employed both shell corporations and offshore bank accounts to conceal the proceeds of the fraudulent scheme. *See Beckner*, 2023 WL 4157269, at *41–42.

Defendant argues that the "sophisticated means" enhancement was improper because he did not offshore any of the funds from the loans and investors but used them domestically to improve and operate the truck stop. He argues that he drew a salary that was not extravagant and that the enterprise collapsed financially because of *un*sophisticated management.

Defendant's arguments, however, are largely directed to the level of sophistication he exercised in running the business operations of the truck stop.

When running the illegitimate part of the enterprise, Defendant used the Panamanian shell corporations Petro Fuels and Seashell—with Romero as their straw owner—to stash the proceeds of the scheme, concealing any direct connection to himself. He used offshore bank accounts, including those of Petro Fuels and Seashell, for the same purpose. We conclude that the district court could properly apply the enhancement.

### 3.    *Disparity with co-defendant's sentence*

Finally, Defendant contends that the disparity between his 210-month prison sentence (at the bottom of his advisory guideline imprisonment range of 210–262 months) and Herlihy's single day of imprisonment renders Defendant's sentence substantively unreasonable.

But the concern of the guidelines is disparities between similarly situated defendants—that is, defendants with similar criminal histories who commit similar offenses. *See* 18 U.S.C. § 3553(a)(6) (requiring sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); *see also United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006) ("[A] criminal defendant alleging a disparity between his sentence and that of a co-defendant is not entitled to relief from a sentence that is properly within the sentencing guidelines and statutory requirements"). There is no such similarity between Defendant and Herlihy. We have already noted the district court's determination that Herlihy was not a leader "on anything close to the level that [Defendant] has been." R., Vol. 2 at 1099. And in

28

addition, Herlihy pleaded guilty while Defendant went to trial, and Defendant had a far worse criminal history, having already been convicted of serious fraud (recall that his previous restitution debt exceeded $15 million).

## III.    CONCLUSION

We **AFFIRM** the judgment of the district court and **GRANT** Defendant's motion for an extension of time to supplement the record.